[No. 17492-4-I. Division One. August 17, 1987.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSEPH SHERMAN SARGENT, *Appellant*.

*Helen L. Halpert* of *Seattle–King County Public Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney, Deborah J. Phillips, Senior Appellate Attorney,* and *Michael Schwartz, Deputy,* for respondent.

SCHOLFIELD, C.J.—Joseph Sherman Sargent appeals his conviction of murder in the first degree and arson in the first degree. We modify and affirm.

### FACTS

Sargent was charged by information with one count of first degree murder and one count of first degree arson, arising from the death of his wife, Lori. On July 11, 1983, the crimes were discovered when the Seattle Fire Department was called to the Sargent home in West Seattle. A paramedic found a body, later identified to be that of Lori Sargent, lying on a waterbed. An autopsy revealed that the cause of death was two head wounds and severe skull fractures, apparently caused by blows with a blunt instrument. The fire was determined to have been caused by the igniting of a flammable liquid in the bedroom.

After discovery of the victim, the police attempted to find Sargent, who did not appear for work that day. He was eventually discovered at the home of relatives in Oregon and was charged with the crimes on July 19, 1983. The jury rendered a guilty verdict in Sargent's first trial.

Prior to sentencing, Ronald Bloom, a Department of Corrections community corrections officer (formerly designated a probation and parole officer) arranged to interview Sargent to prepare a presentence report.

Bloom testified that the interview in the jail never really focused on Sargent's version of the events because Bloom felt that Sargent was denying his participation in the crime. Bloom further testified that he told Sargent that if Sargent expected to benefit from mental health counseling in prison, he would have to "come to the truth with himself",

implying that he should acknowledge his guilt to himself. Bloom testified that he did not promise Sargent any leniency for confessing. At the end of the interview, Bloom gave Sargent his card and told him that if he had any more to say, he could contact Bloom.

Bloom did not at any time suggest to Sargent that he write out a statement. During that first interview, Bloom spent over 2 hours listening to Sargent complain bitterly about the "system" and the prosecutor and protest his innocence. Bloom's suggestion that Sargent "come to the truth with himself" was apparently based on considerations for his mental health and the beneficial effects of accepting responsibility for one's own actions.

Two days after the initial interview, Sargent telephoned Bloom and told him that he was willing to make a written statement regarding the crime. Bloom mentioned this to his supervisor, who told Bloom to return to the jail to take the statement. When the subject of *Miranda* rights arose, the supervisor reminded Bloom that community corrections officers were not required to give *Miranda* warnings. To the best of Bloom's recollection, the supervisor also told Bloom to contact both the prosecutor's office and Sargent's attorneys, but he did not do so until after the second interview with Sargent.

Bloom had no conversations before the two interviews with any law enforcement officer or the prosecuting attorney. When Bloom met with Sargent the second time, after a few brief remarks to one another, Bloom gave Sargent a legal pad and pencil. Sargent wrote out a 2½–page statement in which he admitted killing his wife and setting fire to the house. Sargent told Bloom after he completed the statement that he was "'coming clean with God'".

Sargent's first trial was reversed by this court on several grounds, including prosecutorial misconduct in the State's closing argument. *State v. Sargent,* 40 Wn. App. 340, 698 P.2d 598 (1985).

At Sargent's second trial, the State sought to introduce his written confession and the telephone statements made

to Bloom. After extensive pretrial argument, the trial court suppressed the confession and statements. On a motion for reconsideration, however, the court determined that the statements made on the telephone and the written statement taken in the second interview were admissible because 2 days had passed between the initial presentence interview and Sargent's phone call to Bloom, such that the confession was volunteered, not custodial. However, the court found that the first interview constituted custodial interrogation and ruled that any statements made then were not admissible.

■ The trial court also determined that the constitutional prohibition against double jeopardy did not bar a retrial, despite the intentional nature of the prosecutor's statements in the closing argument of the first trial. The double jeopardy issue was not raised in the motion for reconsideration. Following the CrR 3.5 hearing, Sargent entered a stipulation to the facts as contained in the police report, with the understanding that the court would make its determination based on those police reports. The court found Sargent guilty as charged. This appeal timely followed.

Three of Sargent's assignments of error relate to the admission in his second trial of the confession he gave to Bloom. The fourth assignment asserts that the retrial violated the constitutional prohibition against double jeopardy.

Sargent asserts that admission of the confession violated both his Fifth Amendment protection against self–incrimination and his Sixth Amendment right to assistance of counsel. Sargent also argues for a public policy prohibiting use in a subsequent trial of a confession obtained as part of an interview conducted for presentence purposes.

### FIFTH AMENDMENT

*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966) held the prosecution could not use inculpatory statements stemming from custodial

interrogation of the defendant without first showing the defendant was fully advised of the privilege against self–incrimination and of his right to counsel and that the defendant had knowingly, voluntarily, and intelligently waived those rights.

*Miranda* defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* at 444.

Cases deciding the issue of whether *Miranda* applies to a given set of facts appear to be more concerned with whether a "custodial interrogation" took place than with whether the interrogation was by a law enforcement officer. In *State v. LaRue,* 19 Wn. App. 841, 845, 578 P.2d 66 (1978), this court said:

> If such a custodial interrogation is established, it makes no difference that the interrogators were prison guards, rather than police officers. The duty to apprise a defendant of his constitutional rights has been assigned to persons other than police officers. *See Mathis v. United States,* 391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503 (1968) (statements made to IRS agent); *United States v. Redfield,* 402 F.2d 454 (4th Cir. 1968) (statements made to a prison warden); and *Biddy v. State,* 127 Ga. App. 212, 193 S.E.2d 31 (1972) (statements made to a prison warden).

In *State v. Cawley,* 133 Ariz. 27, 648 P.2d 142 (Ct. App. 1982), Cawley complained that he was interviewed for presentence purposes without being given his *Miranda* warnings. The Arizona court responded at page 29 as follows:

> We hold that where the presentencing investigation is not accusatory in nature and merely a routine and integral part of the sentencing process, a defendant is not entitled to Miranda warnings since the in–custodial coercive atmosphere of *Miranda* is not present and the questioning is not accusatory in nature.

We hold that Sargent's written statement was self–initiated and was entirely voluntary. None of the elements of

coercion which are typically found in those cases where *Miranda* warnings are required are present in the case before us. The record is clear that at the initial interview, Bloom asked no questions that were not directed toward development of the customary information needed for a presentence report.

Sargent argues that the suggestion made to him by Bloom that he "come to the truth with himself" amounts to interrogation for the purpose of eliciting an incriminatory response. We disagree. Bloom had listened to Sargent blame the system and the prosecutor for his conviction. Sargent was not accepting any of the blame himself. Bloom did nothing more than suggest to him that it would be beneficial to Sargent's mental health for him to face the truth. This suggestion was not designed to elicit an incriminatory response. Bloom did not ask him to make a public or written confession nor a statement of any kind. It was a suggestion as to how he could best cope with the extended incarceration that was sure to follow.

After the initial interview, Sargent waited 2 days before he contacted Bloom on his own initiative. It is an unavoidable conclusion that his decision to make a written confession was a decision arrived at entirely on his own after thinking about it for 2 days.

When Bloom went to the county jail for the second interview, there was no conversation in which Bloom encouraged Sargent to make a confession. There was virtually no conversation at all preceding Bloom's handing a pad of paper and a pencil to Sargent. Upon receiving the paper and pencil, Sargent wrote out the confession in his own hand without any prompting or assistance of any kind from Bloom.

The law does not require a probation or corrections officer, prior to developing information for a presentence report, to give *Miranda* warnings to a defendant whose guilt has been established either by plea, judgment or verdict. *See State v. Cawley, supra.* The reason for this is that the entire process of taking information for a presentence

report is nonaccusatorial. The information developed normally has no bearing on guilt or innocence of the defendant. It is merely a development of information that experience has proven to be helpful to a sentencing judge in carrying out the sentencing function.

Sargent argues that after his phone call to Bloom, Bloom had reason to anticipate that Sargent was going to make an incriminating statement about the crimes for which he had been convicted and at that point Bloom should have given him *Miranda* warnings. While it is true that Bloom may have had a basis for anticipating an incriminating statement, a law enforcement officer is not required to interrupt a voluntary confession by giving the *Miranda* warnings. *Miranda,* at 478; *State v. Lucia,* 74 Wn.2d 819, 447 P.2d 606 (1968).

Admission of Sargent's confession in the second trial did not violate his privilege against self–incrimination guaranteed by the Fifth Amendment.

## SIXTH AMENDMENT

The right to assistance of counsel granted by the Sixth and Fourteenth Amendments attaches once the defendant has been charged. It applies not only to the trial, but to all critical stages in the criminal justice process. *Maine v. Moulton,* 474 U.S. 159, 88 L. Ed. 2d 481, 106 S. Ct. 477 (1985). An analysis of whether a confession has been obtained in violation of a defendant's right to counsel requires a determination of whether the statement was (1) deliberately elicited (2) at a time when the defendant was denied access to counsel.

Turning first to the "deliberate elicitation" issue, in *Massiah v. United States,* 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199 (1964), the petitioner was indicted and arraigned. He had retained counsel and was released on bail. A codefendant decided to cooperate with the government and agreed to the installation of a radio transmitter under the front seat of his car so that conversations in the car could be overheard by government agents. Having no

knowledge of these arrangements, Massiah engaged in friendly conversations with the codefendant in his car, during which he made several incriminating statements. These statements were admitted over objection in Massiah's trial, and he was convicted. The Court held Massiah's right to assistance of counsel had been violated and reversed the conviction.

Similarly, in *Maine v. Moulton, supra,* the codefendant cooperated with the police and wore a body recorder/transmitter at a meeting with Moulton, thus recording incriminating statements by Moulton which were used against him at trial. Moulton's conviction was also reversed on Sixth Amendment grounds.

In *United States v. Henry,* 447 U.S. 264, 65 L. Ed. 2d 115, 100 S. Ct. 2183 (1980), Henry was held in jail following his arrest and had appointed counsel. Nichols, a paid informant, was an inmate at the same jail. Nichols was told by government agents to pay attention to statements made by other prisoners in his cellblock, but was instructed not to initiate any conversations with Henry regarding the charged bank robbery. Nichols and Henry subsequently engaged in conversations in which Henry incriminated himself, and Nichols testified to those conversations at Henry's trial. Henry was convicted, and the Supreme Court reversed, finding that the government had "deliberately elicited" incriminating statements in violation of Henry's Sixth Amendment right to counsel. *Henry,* at 270.

The difference between the fact patterns in *Massiah, Moulton* and *Henry* on the one hand, and the fact pattern in the case before us, is clear. Bloom was not a secret informant. His employment and purpose were fully and accurately explained to Sargent. There was no deception of any kind. Bloom had no undisclosed purpose to extract incriminating information from Sargent. He was not acting under instructions from any police officer or prosecutor. The vice condemned in *Massiah, Moulton,* and *Henry* was deception employed by the government for the purpose of obtaining incriminating information under circumstances where the

deception effectively denied the defendant assistance of counsel.

However, deception is not the only possible circumstance under which a defendant's right to counsel may be violated.

In *Cahill v. Rushen,* 678 F.2d 791 (9th Cir. 1982), the defendant promised police that after his trial he would tell them all the facts regarding the murder with which he was charged. The day after Cahill was convicted the police captain brought Cahill to his office, but did not give *Miranda* warnings or notify defense counsel of the meeting. Cahill confessed to the murder and stated that he believed the confession would have no adverse consequences, since he had already been convicted. Cahill's first conviction was overturned for failure to give a proper accomplice instruction. Upon retrial, the court denied Cahill's motion to suppress the confession.

The Court of Appeals reversed, holding that the right to counsel is not terminated by a defendant's conviction and sentencing, but rather continues on through any appeal process or retrial. The court determined the police captain violated Cahill's Sixth Amendment right to counsel because he deliberately elicited Cahill's confession in the absence of counsel. *Cahill,* at 794–95. This requirement of deliberate or intentional elicitation of the statement on the part of the State is a strong one. In the absence of deliberate or intentional misconduct on the part of police or other officers, it cannot be said that a defendant's Sixth Amendment right to counsel is violated.

In *State v. Brooks,* 38 Wn. App. 256, 684 P.2d 1371, *review denied,* 103 Wn.2d 1005 (1984), a cellmate of the defendant Brooks engaged in conversations with him in which Brooks made statements about the murder with which he was charged. Learning of this, detectives of the Snohomish County Sheriff's Office told the cellmate they were interested in what Brooks had to say about the death of the victim, but promised no rewards or "deals" of any kind and did not request the cellmate to elicit any information from Brooks. The cellmate testified over objection

to incriminating statements made by Brooks. On appeal, this court held that the cellmate was not an agent of the State and that the police did not intentionally create a situation likely to induce the defendant to make incriminating statements. The court stated:

> [T]he police in this case did not intentionally create a situation likely to induce the defendant to make incriminating statements, nor was there any deliberate and surreptitious interrogation of the defendant. Accordingly, the defendant was not denied his right to counsel as guaranteed by the sixth amendment to the United States Constitution.

*Brooks,* at 262.

In addition to the requirement of deliberate elicitation of a confession, a defendant's Sixth Amendment right to counsel is only violated if this deliberate elicitation takes place under circumstances in which a defendant is denied access to his counsel.

In *Estelle v. Smith,* 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981), the defendant submitted to a court-ordered pretrial psychiatric examination. During the capital sentencing phase of the defendant's murder trial, the psychiatrist who performed the competency examination gave his opinion on the defendant's future dangerousness, which is one of the critical questions involved in imposition of the death penalty. The United States Supreme Court upheld the district court in its vacation of the death sentence, finding that it was imposed in violation of the defendant's Sixth Amendment right to counsel. The Court noted that it was unclear from the record whether defense counsel was informed of the competency examination prior to its occurrence. Defense counsel were not notified in advance that the psychiatric examination would encompass the issue of their client's future dangerousness. More importantly, however, the defendant was not afforded access to his counsel for advice as to whether to submit to the examination and to what end the psychiatrist's findings could be employed. *Estelle,* at 471.

*State v. Knapp,* 111 Wis. 2d 380, 330 N.W.2d 242 (Ct. App. 1983) interpreted *Estelle* as follows:

> [T]he crucial factor [in *Estelle*] was whether the state's actions denied the defendant *the opportunity to receive advice* from his attorney before making significant decisions regarding his defense . . .

*Knapp,* at 383.

Applying the law to the facts before us, we find that Sargent's Sixth Amendment right to counsel was not violated. Sargent's statement was not "deliberately elicited" by Bloom. No deception was practiced by the police or prosecutor to trap Sargent into a confession. The discussion at the first presentence interview never focused on Sargent's version of the events. When Bloom returned to see Sargent the second time, he merely gave Sargent a pad of paper and did not encourage him one way or the other. Bloom's comments to Sargent that he ought to "come to the truth with himself" do not rise to the level of deliberate elicitation.

In addition, Sargent was not denied access to counsel prior to making the decision to confess. Defense counsel had been informed of Sargent's initial presentence interview and had declined to be present. There was ample opportunity for his counsel to contact Sargent or for Sargent to contact counsel prior to his being interviewed by Bloom. Being familiar with presentence reports, defense counsel was aware of the potential for Sargent to make incriminating statements when he was asked for his version of the events.

Unlike the circumstances in *Estelle,* Sargent and his counsel had the opportunity to confer and to decide what Sargent should tell the presentence investigator. Following the first interview, Sargent could easily have contacted his counsel before calling Bloom to schedule the second interview. Thus, we find that Sargent was not denied access to counsel. In the absence of deliberate elicitation of his confession and in the absence of denial of access to counsel, we hold that Sargent's Sixth Amendment right to counsel was not violated.

## PUBLIC POLICY

Sargent argues public policy requires a rule that the State be denied the right to use in any subsequent trial incriminating statements made in the context of a presentence investigation. He contends that in the absence of such a rule, defendants who are appealing their convictions will not be candid with the presentence investigator for fear of incriminating themselves. Sargent suggests that the sentencing judge would then be making sentencing decisions without complete information about a particular defendant.

█ Although this argument has some merit, we are not sufficiently persuaded such a rule is necessary. The Sentencing Reform Act of 1981, RCW 9.94A, is designed to ensure proportionate sentencing based on the seriousness of the offense and the offender's criminal history and to ensure that a sentence is commensurate with the punishment imposed on others for similar offenses.

Given the limited discretion now permitted a sentencing judge, we no not believe the defendant's version of the crime (or the lack of such information) seriously impacts a sentencing decision. This is especially true if counsel informs the sentencing judge that the defendant is not speaking about the offense pending appeal. Thus, we believe sentencing judges will still be able to make informed sentencing decisions, even if defendants elect not to give their version of the crime to the presentence investigator. We, therefore, decline to adopt Sargent's proposed rule.

## DOUBLE JEOPARDY

█ Sargent argues that his retrial violated the double jeopardy clause of the Fifth Amendment. He relies upon the conclusion in *Sargent* that the prosecutor's conduct in the first trial was "flagrant and ill intentioned". *Sargent,* at 345.

The double jeopardy clause does not bar retrial of a defendant after a tainted conviction is reversed unless

the defendant can show that the taint was a product of deliberate harassment or overreaching.

*State v. Funkhouser,* 30 Wn. App. 617, 622–23, 637 P.2d 974 (1981). *Accord, State v. Fleming,* 41 Wn. App. 33, 701 P.2d 815 (1985).

We have reviewed the *Sargent* opinion. Apparently, the deputy prosecutor improperly vouched for the credibility of a prosecution witness, in the context of rebuttal to an argument previously made by defense counsel. The import of the defense argument was that since the deputy prosecutor did not mention the witness in his opening statement and referred to the witness only briefly in closing remarks, the deputy prosecutor did not believe the witness and did not want to appear to the jury to be basing his case on that testimony.

It was in rebuttal to this argument by defense counsel that the deputy prosecutor told the jury that the inference he had no confidence in the witness was erroneous, and he then proceeded to make statements to the effect that he believed the witness in the critical parts of his testimony.

We believe that an argument made in rebuttal is unlikely to be the product of deliberate harassment. Presumably, if the defense counsel had not made the argument she did, the deputy prosecutor would never have made the statements in rebuttal that he made. In that context, the deputy prosecutor's remarks fall short of "deliberate harassment or overreaching."

We also believe it would be particularly inappropriate to deny the State a retrial under the circumstances of this case where prosecutorial misconduct was only one of several grounds on which the prior conviction was reversed. The retrial of Sargent did not violate the double jeopardy clause.

The judgment of the trial court is affirmed.

COLEMAN and WEBSTER, JJ., concur.

Review granted by Supreme Court March 1, 1988.