[No. 54664-9.  En Banc.  October 27, 1988.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSEPH SHERMAN SARGENT, *Petitioner*.

*Helen Halpert* of *Seattle–King County Public Defender Association,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Sally F. Stanfield, Deputy,* for respondent.

DORE, J.—We hold that the State violated Sargent's Fifth and Sixth Amendment rights when a probation officer preparing a sentencing statement failed to give defendant *Miranda* warnings and assistance of counsel. The interview resulted in a confession which was admitted at Sargent's second trial to establish guilt of first degree murder and first degree arson. Sargent was convicted at that second trial on stipulated facts. We reverse.

## FACTS

Following Sargent's first conviction on charges of murder and arson, the trial judge ordered a presentence report pursuant to RCW 9.95.200 and former CrR 7.2(b). Ronald Bloom, a probation officer for the King County Corrections Department, was assigned to prepare the report. On or about November 5, 1983, Bloom met with Sargent in the visiting area of the King County Jail, in a booth separated by a glass wall. Mr. Sargent was locked into his side of the booth. At no time did Bloom administer *Miranda* warnings to Sargent.

In the course of the interview, Sargent informed Bloom of his plan to appeal his convictions. Near the end of the interview, Bloom asked Sargent if he was guilty. Sargent asserted his innocence. Bloom stated:

[A]s far as I was concerned, he was guilty of the charge. I further told him that if he was to benefit from mental health counseling, it was my impression that he would have to come to the truth with himself. And I guess essentially that means that he is going to have to admit that he committed the crime.

Report of Proceedings vol. 1, at 20. Mr. Bloom repeated this argument to Sargent. Report of Proceedings vol. 1, at 24. On leaving the interview room, Bloom handed Sargent his card and told him to call "if there's something else that he regard[ed] as significant . . ." Report of Proceedings vol. 1, at 25–26.

Several days later,[1] Sargent called Bloom, indicated that he wished to make a written statement, and asked Bloom to visit him in jail. Mr. Bloom understood this to mean that Sargent wished to confess. Report of Proceedings vol. 1, at 29. Bloom discussed the telephone call with co–workers, and the officers joked about the possibility of giving *Miranda* warnings. Bloom discussed the situation with his supervisor and, according to Bloom, was "probably" instructed to contact both the prosecutor and the defense counsel prior to speaking to Sargent. Report of Proceedings vol. 1, at 28. Bloom disobeyed this order and did not contact either attorney.

Bloom met with Sargent the day after he received the telephone call. Again Bloom did not administer *Miranda* warnings to Sargent. Clerk's Papers, at 21. Bloom merely handed Sargent a legal pad and pencil, with which Sargent wrote out his confession. Report of Proceedings vol. 1, at 29–30. There was little or no communication between Bloom and Sargent during the second interview as the defendant quietly wrote out his confession, while Bloom busied himself making out other reports. The second interview lasted approximately 15 minutes. Bloom contacted

---

[1]The dates are unclear. The written confession is dated November 10. Bloom testified that Sargent called him 2 or 3 days after the first interview. Report of Proceedings vol. 1, at 26; Clerk's Papers, at 21.

Sargent's defense counsel only after obtaining the confession. The next day, the original confession was in the prosecutor's file. Bloom, when questioned, said he gave it to the prosecutor because he thought it might get lost in his file. Report of Proceedings vol. 1, at 45. The substance of the confession was incorporated in the presentence report. Report of Proceedings vol. 1, at 44.

Sargent's convictions were reversed on appeal. *State v. Sargent,* 40 Wn. App. 340, 698 P.2d 598 (1985) (*Sargent* I). On remand, the State sought to use the confession received by Bloom. Following a hearing, Superior Court Judge Faith Enyeart suppressed the confession. On the State's motion for reconsideration, however, she reversed her decision and ruled that the confession was admissible. She concluded that the first interview was a custodial interrogation, requiring *Miranda* warnings. Judge Enyeart, however, admitted the written confession secured during the second interview on the ground that it did not flow from, and was not tainted by, the improper custodial interrogation of the first interview. The State did not assign error to the finding that the first interview was a custodial interrogation.

Stipulated findings of fact and conclusions of law were entered on December 11, 1985 and Sargent was convicted of first degree murder and first degree arson. Clerk's Papers, at 23–26.

A certificate pursuant to CrR 3.5, based on the suppression hearings was entered on December 11, 1985. In the findings and conclusions of that certificate, Judge Enyeart also ruled admissible the telephone statements made by Sargent to Bloom. Clerk's Papers, at 21–22.

The Court of Appeals affirmed Sargent's conviction, rejecting his argument that the confession was improperly admitted because it was obtained in violation of his Fifth and Sixth Amendment rights. *State v. Sargent,* 49 Wn. App. 64, 741 P.2d 1017 (1987) (*Sargent* II).

## ISSUES

This case presents a number of issues: (1) Was the second interview a knowing exploitation of an opportunity to contact the defendant in the absence of counsel in violation of the Sixth Amendment? (2) Was the first interview a custodial interrogation by an agent of the State requiring the administration of *Miranda* warnings? (3) Were Sargent's telephone call and his written confession at the second interview voluntary acts by Sargent or tainted responses to a custodial interrogation by Bloom?

## SARGENT'S SIXTH AMENDMENT RIGHT
### TO COUNSEL WAS VIOLATED

The Court of Appeals held that Sargent's Sixth Amendment right to counsel was not violated because Bloom did not engage in subterfuge in obtaining the written confession. It held that Sargent voluntarily initiated the second conversation with Bloom. The proper standard, however, is whether the State "knowingly circumvents" the right to counsel. The standard of knowledge is objective: whether the State knew or should have known that the contact in the absence of counsel would prejudice the defendant.

In *Maine v. Moulton,* 474 U.S. 159, 88 L. Ed. 2d 481, 106 S. Ct. 477 (1985) Maine arranged for Moulton's codefendant to wear a microphone and to discuss a coordinated defense against pending charges. The conversation occurred in the absence of counsel after Moulton had been arraigned and had asserted his Sixth Amendment right to counsel. The defendant, not the State or its informant, initiated the conversation. Though the State engaged in subterfuge, the Court made clear that it was not the State's deceit per se which violated the right to counsel.

> Thus, the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. However, *knowing exploitation by the State of an opportunity to confront the accused without*

*counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.* Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

(Citation omitted. Italics ours.) *Moulton,* at 176.

The State "knowingly circumvents" the right to counsel when it knows, *or should know* that the defendant will make incriminating statements without the assistance of counsel. In *United States v. Henry,* 447 U.S. 264, 65 L. Ed. 2d 115, 100 S. Ct. 2183 (1980), a cell mate of the defendant was instructed to listen to and report on conversations of the defendant, but was specifically instructed not to initiate conversation. Contrary to instructions, the cell mate did question Henry about the crime. The Court held that the Sixth Amendment had been violated because the State "must have known" that the cell mate would violate his instructions in attempting to cooperate and win favorable treatment. *Henry,* at 271. The opinion in *Moulton* also makes clear that an objective standard of knowledge applies. *Moulton,* at 176 n.12.

Regardless of the fact that Bloom's statements in the initial interview were not intended as a subterfuge for obtaining a confession, Bloom "knowingly circumvented" Sargent's right to counsel at the second interview. Following Sargent's telephone call, Bloom knew that Sargent intended to confess. Bloom's superior "probably" instructed him to contact Sargent's counsel. Bloom did not do so. Instead, he simply provided Sargent with pencil and paper, knowing full well that Sargent intended to give a written confession. The assistance of counsel at this juncture was critical because, as Bloom knew, Sargent's appeal was pending.

The right to counsel extends to any transaction bearing on a meaningful defense.

[I]n addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial. . . .

. . . It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice.

(Footnotes omitted.) *United States v. Wade,* 388 U.S. 218, 226–27, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967). It is a virtual certainty that Sargent did not understand that he was at risk in his conversations with Bloom. He was ignorant of the fact that, if his conviction was overturned on appeal, the confession would render his new trial a formality. In a case with virtually identical facts, the Ninth Circuit held that it is this precise risk that the right to counsel is meant to guard against. *Cahill v. Rushen,* 678 F.2d 791, 794 (9th Cir. 1982). Bloom knowingly denied the assistance of counsel to Sargent in violation of his Sixth Amendment rights.

### CUSTODIAL INTERROGATION

The trial court found that the first interview was a custodial interrogation requiring the administration of *Miranda* warnings. The State has not assigned error to that finding, and it becomes the law of the case. It is therefore established on appeal. *State v. Hubbard,* 103 Wn.2d 570, 693 P.2d 718 (1985). Nevertheless, in view of the Court of Appeals analysis, we feel compelled to set forth our reasoning on the issue.

Sargent claims that when Bloom interviewed him in connection with the sentencing report, the Fifth Amendment required that he be advised of his right to remain silent and of his right to an attorney. This contention turns on whether any part of the first interview was: (a) custodial; (b) interrogation; (c) by an agent of the State. *Miranda v. Arizona,* 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

The State argues that the only question is whether Sargent was compelled to speak. Brief of Respondent, at 9. The Court of Appeals took a similar approach. While this analysis is correct for the Fifth Amendment question, where the issue is only whether the confession is compelled, the analysis is very different where *Miranda* applies. *Minnesota v. Murphy,* 465 U.S. 420, 429, 79 L. Ed. 2d 409, 104 S. Ct. 1136 (1984).

It is true that, as a general rule, the Fifth Amendment privilege against self–incrimination must be asserted; it is not self–executing. *Garner v. United States,* 424 U.S. 648, 654 n.9, 47 L. Ed. 2d 370, 96 S. Ct. 1178 (1976).

> Thus it is that a witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself . . . But if he chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so.

(Citation omitted.) *Minnesota v. Murphy,* 465 U.S. at 429. It must be stressed, however, that this is the *general* rule. Once a person is taken into custody, the presumption of voluntariness disappears. *Murphy,* at 429. Instead, self–incriminating statements obtained from an individual in custody are presumed to be involuntary, and to violate the Fifth Amendment, unless the State can show that they were preceded by a knowing and voluntary waiver of the privilege. The requirement that the waiver be knowing necessitates the *Miranda* warnings.

> The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.

*Colorado v. Spring,* 479 U.S. 564, 574, 93 L. Ed. 2d 954, 107 S. Ct. 851, 858 (1987). The State concedes that no warnings were ever given Sargent. The question is therefore whether

any part of the first interview was a custodial interrogation by a State agent.

(a) The interview was "custodial".

Sargent was unquestionably in custody when this interview took place. He was in jail, locked in the interview booth. These restraints on his freedom of movement constitute custody for *Miranda* purposes.

The State made the following argument in its brief and at oral argument.

> While Sargent lacked the physical freedom to simply walk away from the interview booth, he was in the identical interview area where he would have spoken to his attorneys, an area where he could simply push a buzzer, summon a jail guard and be returned to the jail . . . As noted in *Murphy, Miranda* warnings are intended to protect a suspect thrust into an "unfamiliar atmosphere" or an "interrogation environment" who may think the interrogation will continue until he confesses.

Brief of Respondent, at 12. The critical inquiry, however, is not the psychological state of the defendant, but simply whether his freedom of movement was restricted. In *Oregon v. Mathiason,* 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711 (1977), the psychological atmosphere was extremely intimidating: the defendant was interviewed in a police station, was told he was a suspect, and that his statements would be evaluated by the district attorney and was told falsely that his fingerprints had been found at the scene of the crime. *Miranda* warnings were not given. The Supreme Court held that the Fifth Amendment was not violated because the defendant was free to go at any time, and had been told so.

> Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment."

*Mathiason,* at 495. Thus, freedom of movement, not the atmosphere or the psychological state of the defendant, is the determining factor in deciding whether an interview is

"custodial." *California v. Beheler,* 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 103 S. Ct. 3517 (1983). Since Sargent's freedom of movement was unquestionably limited, the interview with Bloom was "custodial" for Miranda purposes.

(b) Bloom engaged in "interrogation".

The United States Supreme Court defined "interrogation" for Fifth Amendment purposes in *Rhode Island v. Innis,* 446 U.S. 291, 301, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980), *cert. denied,* 456 U.S. 930 (1982).

> That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

(Footnotes omitted.) *Innis,* at 301. There is no question that Bloom's statements at the first interview amount to interrogation under the *Innis* standard. He asked Sargent "Did you do it?" Report of Proceedings vol. 1, at 19. This is not the functional equivalent of interrogation—it *is* interrogation.

Bloom's further statements to the effect that Sargent should "come to the truth" with himself and that Sargent could not benefit from mental health counseling unless he did so, clearly did, *from Sargent's point of view,* call for a response. Bloom in effect made confessing a precondition to treatment. Under *Innis,* Bloom knew or should have known that Sargent might desire such treatment and would, in light of Bloom's statement, feel compelled to confess to obtain it. If Sargent misunderstood Bloom, *Innis* requires us to place the burden of that misunderstanding on the State. The misunderstanding, if there was one, resulted at least in part from Sargent's natural desire to cooperate with Bloom. This is just the sort of psychological coercion inherent in custodial situations which *Miranda* recognizes as the basis of its custodial interrogation standard. Bloom knew or

should have known that Sargent was reasonably likely to confess as a result of such a statement made under these circumstances.

The State stresses in several places that Bloom had no intention of extracting a confession from Sargent. As the quotation from *Innis* indicates, that fact is irrelevant. The standard is an objective one, focusing on what the officer knows *or ought to know* will be the result of his words and acts. The subjective intentions of the officer are not at issue.

The State suggests that because the preparation of a presentence report is a routine post–conviction procedure in which *Miranda* warnings are not customarily given, no interrogation within the meaning of *Miranda* could have taken place here. Brief of Respondent, at 10. However, the nature of the procedure during which the question is asked is not decisive; the nature of the question is. *In re Gault*, 387 U.S. 1, 47, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967). While it is well established that routine booking procedures do not call for *Miranda* warnings, this court recently held that a question which is not necessary for booking the defendant is interrogation for *Miranda* purposes. *State v. Wheeler*, 108 Wn.2d 230, 239, 737 P.2d 1005 (1987). *See Mathis v. United States*, 391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503 (1968).

Bloom's statements amount to improper interrogation for the same reason statements made during booking were held to be interrogation in *Wheeler*. Bloom's statements to Sargent were not necessary to the preparation of the presentence report. While RCW 9.95.200 authorizes the probation officer preparing such a report to inquire into the circumstances surrounding the commission of the crime and concerning the defendant, Bloom testified that his statements were intended to assist Sargent in benefiting from treatment, not to assist Bloom in the preparation of his report. Report of Proceedings, at 24; Clerk's Papers, at 21. That sort of counseling is not within the scope of Bloom's duties.

Furthermore, even if Bloom's statements could be considered proper questions, it was not necessary, for the purposes of his report, to obtain a written confession from Sargent. Therefore, since Bloom's statements and actions were unnecessary to the performance of his duties and were reasonably likely to result in an incriminating statement, they constituted an "interrogation" for *Miranda* purposes.

(c) Bloom was an "officer of the State."

The final question in determining whether *Miranda* warnings were required in the first interview is whether Bloom was an officer of the State. When a probation officer is assigned by the Department of Corrections to prepare a sentencing statement at the request of a judge of the superior court, he becomes an officer of the State. In the context of deciding that a defendant's request to see his probation officer during questioning is not an invocation of the right to counsel, the United States Supreme Court stressed the fact that the probation officer's allegiance is unquestionably due the State, not the defendant.

> Moreover, the probation officer is the employee of the State which seeks to prosecute the alleged offender. He is a peace officer, and as such is allied, to a greater or lesser extent, with his fellow peace officers. He owes an obligation to the State, notwithstanding the obligation he may also owe the juvenile under his supervision.

*Fare v. Michael C.*, 442 U.S. 707, 720, 61 L. Ed. 2d 197, 99 S. Ct. 2560 (1979). There is nothing in this case which points to a contrary conclusion and suggests that Bloom at any point ought to have placed Sargent's interests over those of the State in the performance of his duties. Bloom was clearly the agent of the State in this transaction.

Therefore, Bloom was engaged in custodial interrogation as an officer of the State in the first interview with Sargent. *Miranda* warnings were required, but were not given. That does not end the analysis, however, because Sargent made no response at that first interview. Even if Bloom violated *Miranda* in the first interview, the question remains whether Sargent's subsequent telephone conversation and

written confession, which was obtained several days later, are tainted by that violation.

## THE WRITTEN CONFESSION IS TAINTED AND WAS NOT PRECEDED BY A WAIVER

The telephone call and written confession by Sargent were made in response to, and were tainted by, the first interview. There was no knowing, voluntary waiver preceding the written confession, as *Miranda* requires. Therefore, the confession should have been suppressed at the second trial.

The State concedes in its brief that the first interview and Sargent's subsequent incriminating statements cannot be separated.[2] Brief of Respondent, at 13. The Court of Appeals, however, concluded that Sargent's subsequent telephone call and written confession were voluntary and therefore untainted.

> After the initial interview, Sargent waited 2 days before he contacted Bloom on his own initiative. It is an unavoidable conclusion that his decision to make a written confession was a decision arrived at entirely on his own after thinking about it for 2 days.

*Sargent* II, at 70. The proposition that Sargent's confession was unrelated to the interview with Bloom because "his decision to make a written confession was a decision arrived at entirely on his own after thinking about it for 2 days", is self–contradictory. If Sargent's reflection was prompted by Bloom, as that sentence and the entire record suggest, then the confession was caused by Bloom's interrogation and it is tainted. We so find.

There is no support in the case law for the proposition that the mere passage of time can remove the taint of an

---

[2]The State suggests that *Oregon v. Elstad*, 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985) is "helpful" in determining whether Sargent's subsequent statements were tainted. *Elstad* is not helpful because it concerns whether an un–Mirandized but voluntary confession taints a subsequent confession which was obtained after warnings. Here, no warnings were ever given and there is no possibility that the Fifth Amendment flaw was cured by subsequent compliance with *Miranda*.

illegal interrogation from a subsequent confession. The only case considering the argument comes to the opposite conclusion. In *Wainright v. State,* 504 A.2d 1096 (Del. 1986) the defendant was given *Miranda* warnings and asserted his right to an attorney. Prior to his attorney's arrival, a police officer informed him that his codefendant had identified him as the trigger man in the robbery. Wainright contested this, making an incriminating statement that placed him at the scene of the crime. Wainright's statement was made 45 minutes after the police officer's statement, during which time Wainright was alone in his cell. The court's reasoning in holding that the incriminating statement was tainted applies to any period of time.

> The fact that Wainright's elicited reaction came not immediately but forty–five minutes later when taken from his cell to the magistrate court does not sanitize it. . . .
> Nor does the fact that the defendant's statement was made after he was placed alone in a cell render it a purely spontaneous one. Indeed, the opportunity to mull over the effect of Dodson's accusatory statements could reasonably have had the opposite effect—to impress upon the defendant the seriousness of his predicament and the need to rebut his codefendant's accusations. Any attempt to "spark" the accused's initiative to make a statement in the absence of counsel through presentation of evidence will contaminate the waiver.

*Wainright,* at 1103.

Similarly, the fact that Sargent thought about his predicament for several days before calling Bloom does not render the telephone call or the subsequent confession voluntary. The call and the confession were "sparked" by Bloom's statements in the first interview, as the fact that he gave his confession to Bloom instead of a police or corrections officer, or his own attorney, clearly indicates. The passage of time and the opportunity for reflection do not render the confession voluntary if the reflection was prompted by an improper interrogation.

The State also contends that the confession was voluntary because the right against self–incrimination was waived. The Court of Appeals apparently accepted this argument. However, any alleged waiver of the right against self–incrimination must be shown by the State to have been made knowingly and intelligently. *North Carolina v. Butler,* 441 U.S. 369, 373, 60 L. Ed. 2d 286, 99 S. Ct. 1755 (1979). In the absence of any *Miranda* warnings, that showing simply cannot be made. While the waiver need not be express and may be inferred from the totality of the circumstances, it cannot be said that there has been a knowing and intelligent waiver unless it is shown that the defendant knew of his right. Unless the defendant is informed of his right, he cannot be presumed to know it.

*Miranda* expressly prohibits drawing an inference of knowledge of the right against self–incrimination from the circumstances of the defendant.

Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. *No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right.*

(Italics ours.) *Miranda,* 384 U.S. at 471–72. *State v. Thomas,* 16 Wn. App. 1, 9–10, 553 P.2d 1357 (1976). Therefore, since Sargent was never informed of his *Miranda* rights by Bloom, the confession resulting from his conversations with Bloom was not freed from the taint of the *Miranda* violation by a waiver of those rights.

## CONCLUSION

We hold that Sargent's Fifth and Sixth Amendment rights were violated by admission of his confession as evidence of his guilt at trial, as he was not given his *Miranda*

warnings before the probation officer secured his confession and was not given the assistance of counsel at a critical stage of the proceedings.

We hold, however, that Sargent's confession was properly used during his sentencing by the trial judge. A probation officer need not administer *Miranda* warnings to a defendant, providing the information secured is used only for sentencing purposes. Such information cannot be used at trial to determine defendant's guilt or innocence.

We set aside defendant's convictions and remand for retrial for murder and arson.

UTTER and DOLLIVER, JJ., concur.

ANDERSEN, J. (concurring)—█ I agree with the majority's conclusion that the defendant's Fifth Amendment rights were violated by the admission of his presentence investigative confession as evidence of his guilt at the second trial, but do so only on the basis that such confessions obtained in the absence of *Miranda* warnings are not admissible as substantive evidence in a criminal trial.[3]

There being no need to reach the Sixth Amendment right to counsel issue at all, I would not do so, but would rely solely on Fifth Amendment grounds in deciding the case.[4]

PEARSON, C.J., and BRACHTENBACH, J., concur with ANDERSEN, J.

DURHAM, J. (dissenting)—The majority finds that defendant Joseph Sherman Sargent's confession to murder and arson was obtained in violation of the fifth and sixth amendments to the United States Constitution, and for that reason holds that the confession must be suppressed. I

---

[3]*United States v. Deaton*, 468 F.2d 541, 544 (5th Cir. 1972), *cert. denied*, 410 U.S. 934 (1973); *United States v. Steele*, 419 F. Supp. 1387, 1388 (W.D. Pa. 1976).

[4]*See State v. Claborn*, 95 Wn.2d 629, 632, 628 P.2d 467 (1981); *State v. Anderson*, 44 Wn. App. 644, 648, 723 P.2d 464, *review granted*, 107 Wn.2d 1013 (1986); *review dismissed as moot*, 109 Wn.2d 1015 (1987).

find no evidence that Sargent's rights were violated. Thus, I dissent.

## FIFTH AMENDMENT

Sargent wrote his confession out longhand on or about November 10, 1983, in the presence of a King County probation officer, Ronald Bloom. Bloom visited Sargent on that day at Sargent's unilateral request and asked no questions of him. Bloom merely provided Sargent with pad and pencil and attended to other matters while Sargent prepared his statement.

The majority apparently would concede that Bloom did nothing on the day Sargent confessed to coerce or compel the confession. Nonetheless, the majority believes that the confession was presumptively coerced because several days before Sargent confessed, Bloom subjected him to a "custodial interrogation" without first advising him of his rights in accordance with the rule of *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

I disagree on several points. First, I do not believe Bloom's questioning of Sargent constituted "interrogation" within the meaning of the Supreme Court's *Miranda* decision. *See State v. Sargent,* 49 Wn. App. 64, 70, 741 P.2d 1017 (1987). I will not pursue this issue, however, because even assuming *Miranda* was applicable to Bloom's first meeting with Sargent, I see no reason to hold it applicable to the second. Finally, I find no evidence that Bloom's actions affected Sargent's volition in such a way as to render his later confession involuntary under a conventional Fifth Amendment analysis.

In *Miranda,* the Supreme Court held that, prior to conducting in–custody interrogation of a criminal suspect, police must advise the suspect of his right to remain silent and to the presence of an attorney during questioning. Failure to abide this requirement, or to honor a criminal suspect's assertion of these rights, the Court held, renders

statements made by the suspect during such interrogation inadmissible in a criminal proceeding against him.

*Miranda*'s requirements are "not themselves rights protected by the Constitution".[5] *Michigan v. Tucker,* 417 U.S. 433, 444, 41 L. Ed. 2d 182, 94 S. Ct. 2357 (1974). Rather, they are procedural safeguards the Court formulated as a practical means for ensuring that the Fifth Amendment privilege against self–incrimination is protected. The Court in *Miranda* observed a significant probability that statements elicited by the police during custodial interrogation might be "compelled" within the meaning of the Fifth Amendment. Thus, the Court established a conclusive presumption that such statements *are* obtained in violation of the Fifth Amendment. The *Miranda* Court made clear, however, and in cases since *Miranda* the Court has repeated often, that this conclusive presumption does not arise "outside the context of the inherently coercive custodial interrogations for which it was designed.'" *Minnesota v. Murphy,* 465 U.S. 420, 430, 79 L. Ed. 2d 409, 104 S. Ct. 1136 (1984) (quoting *Roberts v. United States,* 445 U.S. 552, 560, 63 L. Ed. 2d 622, 100 S. Ct. 1358 (1980)). *See also Beckwith v. United States,* 425 U.S. 341, 346, 48 L. Ed. 2d 1, 96 S. Ct. 1612 (1976) ("*Miranda* was grounded squarely in the Court's explicit and detailed assessment of the peculiar 'nature and setting of . . . in–custody interrogation") (quoting *Miranda,* at 445). When the contextual premises of the *Miranda* presumption are not present, therefore, the presumption cannot properly arise, and *Miranda*'s prophylactic rules have no legitimate applicability. *See Minnesota v. Murphy, supra; Rhode Island v. Innis,* 446 U.S. 291, 64

---

[5]The Supreme Court repeatedly has emphasized that "a simple failure to administer *Miranda* warnings is not in itself a violation of the Fifth Amendment." *Oregon v. Elstad,* 470 U.S. 298, 306 n.1, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985), and cases therein cited; *see Moran v. Burbine,* 475 U.S. 412, 424–45, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986). *See also Miranda v. Arizona,* 384 U.S. 436, 457, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966) ("In these cases, we might not find the defendants' statements to have been involuntary in traditional terms.").

L. Ed. 2d 297, 100 S. Ct. 1682 (1980), *cert. denied,* 456 U.S. 930 (1982); *Oregon v. Mathiason,* 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711 (1977); *Beckwith v. United States, supra; Miranda,* at 477–78.

Such is the situation with which we are presented in this case. Even if Sargent's first meeting with Bloom was a "custodial interrogation" within the meaning of *Miranda,* Sargent did not confess at that meeting. Rather, he volunteered his confession after a period of several days during which apparently no one interrogated him or coerced him in any way. With respect to a volunteered statement of this sort, *Miranda*'s requirements are not applicable. *See Miranda,* at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.").

The majority concludes otherwise, apparently of the view that the presumptively compelling pressures of the first meeting between Sargent and Bloom continued in effect after that meeting ended, even as long as the several days that passed before Sargent confessed. Far from furthering *Miranda*'s purposes, I believe this extension of the *Miranda* holding would cut the case "completely loose from its own explicitly stated rationale." *Beckwith v. United States, supra* at 345.

A proper appreciation of *Miranda*'s logical and factual premises makes clear that *Miranda*'s presumption extends *only* to statements made *during custodial interrogation.* The *Miranda* Court's observations concerning "[t]he potentiality for compulsion" of in–custody interrogations, *Miranda,* at 457, included no suggestions that such compulsion might persist following the cessation of questioning. Nor were any of the four confessions the Court ruled inadmissible in *Miranda* made outside the interrogation room. *See Miranda,* at 491–97. Thus, the majority's application of *Miranda* to a confession not made during custodial interrogation is inconsistent with both the purposes and logical

underpinnings of the *Miranda* holding.[6] *See generally Moran v. Burbine,* 475 U.S. 412, 425, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986) ("The purpose of the *Miranda* warnings . . . is to dissipate the compulsion . . . experienced by the defendant *during interrogation*") (italics mine); *Miranda,* at 469 ("Our aim is to assure that the individual's right to choose between silence and speech remains unfettered *throughout the interrogation process.*") (italics mine).

The majority's error is pointed out by our own most recent *Miranda* ruling. In *State v. Wethered,* 110 Wn.2d 466, 755 P.2d 797 (1988), we interpreted the Supreme Court's decisions on the admissibility of evidence obtained derivatively from "non–Mirandized" statements. Dictum in the leading case of *Oregon v. Elstad,* 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985), we noted, "strongly suggests that a *Miranda* violation without actual coercion will not taint evidence derived from a confession, no matter what form such evidence takes." *Wethered,* at 474. We observed also that, under *Elstad,* a confession may be admissible notwithstanding its derivation from an occurrence violative of *Miranda* when the "volition of the defendant [is] an insulating factor". *Wethered,* at 473. On this view, the fact that Bloom may have violated *Miranda* at his first meeting with Sargent does not taint Sargent's later self–initiated confession, if the confession was voluntarily made.

*Miranda's* presumption being inapplicable, a "traditional" constitutional "voluntariness" inquiry is necessary to determine the admissibility of Sargent's confession. *See Beckwith v. United States, supra* at 347–48. This inquiry involves a consideration of the totality of the circumstances in which the confession was made, to ensure that the confession was "the product of a rational intellect and a free

---

[6]Of course, in some circumstances an interrogation might have coercive effects upon a defendant that are felt even after questioning has ceased. *See, e.g., Wainwright v. State,* 504 A.2d 1096 (Del. 1986). *Miranda* does not presume this for all cases, however.

will", *State v. Rupe,* 101 Wn.2d 664, 679, 683 P.2d 571 (1984), and not a result of "coercive police activity". *Colorado v. Connelly,* 479 U.S. 157, 167, 93 L. Ed. 2d 473, 484, 107 S. Ct. 515 (1986). That Sargent experienced a custodial interrogation and then confessed without first being advised of his *Miranda* rights certainly is relevant to this determination, but it is not, as the majority suggests, conclusive. *See Beckwith v. United States, supra* at 348; *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973). Also relevant are his familiarity with his rights, *see Miller v. Fenton,* 796 F.2d 598, 606 (3d Cir. 1986), the nature of the interrogation to which he was subjected, *see Bustamonte,* at 226, and the interposition of other influences in his decision to confess his crimes. *See Colorado v. Connelly, supra.* Considering all of these factors, I do not believe Sargent's confession was the product of government–induced compulsion.

With respect to Sargent's knowledge of his rights, it is significant that the present convictions are not Sargent's first; he previously was convicted of these same charges after a full trial on the merits. While the present record does not indicate how many times before he confessed Sargent was informed of his Fifth Amendment privilege, the experience of his first trial at least suggests that he was not ignorant of his rights.[7] *See* CrR 3.2A(b)(2) (defendant is informed at preliminary appearance of right to counsel); Office of Administrator for the Courts, *Washington State Judges' Benchbook Criminal Forms* CR–03.0100 (1980) (form defendant signs prior to trial evidencing knowledge of rights). *See also Minnesota v. Murphy, supra* at 437 ("'At this point in our history virtually every schoolboy is familiar with the concept, if not the language, of the [Fifth Amendment].'") (quoting *Michigan v. Tucker,* 417 U.S. 433, 439, 41 L. Ed. 2d 182, 94 S. Ct. 2357 (1974)).

---

[7]Indeed, Sargent exercised his right to be silent by not testifying at his first trial. *See State v. Sargent,* 40 Wn. App. 340, 698 P.2d 598 (1985).

Considering next the nature of Bloom's "interrogation", nothing about it was coercive. Presentence interviews, in general, are far less intimidating than postarrest interrogation by police. As a result of the trial, the defendant's guilt is established as a matter of law. The focus then switches to the defendant's background, a topic inherently less inculpatory to him. Accordingly, the psychological pressure on the defendant is significantly less than in postarrest interrogation. I also note that the interview in this case lasted approximately 2½ hours and, while not insignificant, was of far shorter duration than most interrogations courts have found violative of the Fifth Amendment privilege. *See Miller v. Fenton, supra* at 606.

The majority asserts that, by exhorting Sargent to "'come to the truth' with himself", Bloom "in effect made confessing a precondition to treatment." Majority, at 650. This distorts the substance of what Bloom said. The gist of Bloom's comment, as nearly as Bloom could recollect it 2 years later, was that Sargent might wish to admit his guilt *to himself* in order to benefit from mental health counseling. Bloom's testimony at the suppression hearing makes clear that he in no way suggested that a confession would improve Sargent's position at sentencing, or that if Sargent failed to confess, he might receive a harsher sentence.[8] Indeed, Bloom directly informed Sargent that the interview, and the report Bloom would prepare based on it, were unlikely to have any effect on Sargent's sentence. Sargent

---

[8] "Q. [The prosecuting attorney] Did you in any way lead [Sargent] to believe that—or say something that would lead him to believe that there would be some benefit to him if he were to tell you what happened, the truth of what happened?

"A. [Bloom] Not me specifically. I again did bring out to him if he was to come to a clear understanding himself of what he did, in fact, do, that he would probably benefit, particularly if he was to enter into treatment. He told me at the time that he was very confused and troubled as to his situation.

". . .

"Q. [Sargent's counsel] And you did indicate that you did discuss the possibility of treatment with him in the prison context if, in fact, he finally did admit to his involvement?

"A. [Bloom] No, he didn't have to admit anything in order to get treatment. He can receive treatment regardless of whether he admits the crime or not."

thus could not reasonably have believed Bloom was threatening to penalize him for not confessing.[9]

The circumstances thus far discussed suggest to me that Sargent's confession was not compelled by Bloom's questioning. Inquiry into the voluntariness of Sargent's confession should not stop at the first meeting between Bloom and Sargent, however.[10] In the "totality of the circumstances", the presence of other influences on Sargent's decision to confess also must be considered. The constitution protects defendants only from governmental coercion; to the extent other motivations and influences were at play, Sargent's confession cannot be said to have been involuntary in the constitutional sense. *See Colorado v. Connelly, supra.*

From Bloom's testimony and from the substance of Sargent's confession, it appears that if Sargent felt any compulsion to confess, the compulsion was of a personal and theistic, not a governmental, nature. Bloom recalled Sargent expressing feelings of "coming clean with God" on the day he tendered his confession. And when he confessed, Sargent "seemed much more comfortable with himself, much more at ease", Bloom testified. The substance and tone of Sargent's confessory statement are consistent with these observations. Sargent affirmed the truth of his account by asserting that "[t]he events I have stated are true and correct, so help me God." He made no mention of desiring mental health treatment, said nothing about Bloom, and his statements revealed no signs of fear, distress, anger, or helplessness. Indeed, far from evidencing compulsion or confusion, the calm and clarity of Sargent's

---

[9]There is no direct evidence that Sargent in fact did perceive Bloom's comment as a threat. But even if he did so view Bloom's comment, and confess with the perceived threat in mind, the unreasonableness of his perception would defeat any claim that his confession was involuntary in the constitutional sense. *See Minnesota v. Murphy,* 465 U.S. 420, 437–38, 79 L. Ed. 2d 409, 104 S. Ct. 1136 (1984); *Miller v. Fenton,* 796 F.2d 598, 610 (3d Cir. 1986).

[10]Because it improperly applies *Miranda,* the majority does end its inquiry at this point.

account of his crimes suggests that the confession was the product of a "rational intellect and a free will." *State v. Rupe, supra* at 679.

The majority completely ignores this direct evidence, preferring to speculate that Sargent "thought about his predicament for several days", and that his confession necessarily was influenced by Bloom's comment about coming to the truth with himself. Majority, at 654. As explained above, Bloom did not put Sargent in a "predicament". Thus, Sargent had nothing to "mull over". Majority, at 653. Even if Bloom's comment fairly could be characterized as somehow coercive, moreover, the substance and circumstances of Sargent's confession in no way suggest that the confession issued under influence of Bloom's conduct. I conclude, therefore, that Sargent's confession was not compelled by the State, and thus that its suppression "would serve absolutely no purpose in enforcing constitutional guarantees."[11] *Colorado v. Connelly, supra* at 166.

## SIXTH AMENDMENT

In addition to finding Sargent's confession inadmissible under the rule of *Miranda,* the majority holds that the confession must be suppressed because Bloom obtained it in violation of Sargent's Sixth Amendment right to counsel. The majority does not—indeed, it cannot on the facts presented—claim that Bloom "deliberately elicited" Sargent's confession, though that is the standard against which Sixth

---

[11]There is no evidence that Bloom acted in bad faith in failing to advise Sargent of his *Miranda* rights. On the contrary, Bloom's unrefuted testimony is that he acted consistently with corrections department policy, which does not require corrections officers to administer *Miranda* warnings before conducting presentence interviews. Whatever the merits of this policy, *cf. Baumann v. United States,* 692 F.2d 565, 574–77 (9th Cir. 1982) (*Miranda* warnings not required before routine presentence interviews; statements admissible for sentencing purposes), Bloom acted reasonably in relying on it. Thus, any deterrent value suppression of Sargent's confession might have is outweighed by the confession's unquestioned probativeness and demonstrated trustworthiness. *See Oregon v. Elstad,* 470 U.S. 298, 308–09, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985); *Michigan v. Tucker,* 417 U.S. 433, 446–47, 41 L. Ed. 2d 182, 94 S. Ct. 2357 (1974).

Amendment claims of this sort are measured.[12] *See Kuhlmann v. Wilson,* 477 U.S. 436, 456–61, 91 L. Ed. 2d 364, 106 S. Ct. 2616 (1986); *Maine v. Moulton,* 474 U.S. 159, 170–76, 88 L. Ed. 2d 481, 106 S. Ct. 477 (1985); *United States v. Henry,* 447 U.S. 264, 270, 65 L. Ed. 2d 115, 100 S. Ct. 2183 (1980); *Brewer v. Williams,* 430 U.S. 387, 399–400, 51 L. Ed. 2d 424, 97 S. Ct. 1232 (1977); *Massiah v. United States,* 377 U.S. 201, 206, 12 L. Ed. 2d 246, 84 S. Ct. 1199 (1964); *State v. Sargent,* 49 Wn. App. 64, 71–76, 741 P.2d 1017 (1987); *State v. Franklin,* 48 Wn. App. 61, 737 P.2d 1047 (1987). Rather, the majority asserts that Bloom violated Sargent's Sixth Amendment right simply by "knowingly circumventing" it.

The majority's rejection of the "deliberately elicited" test in favor of a "knowing circumvention" standard is plain–faced wrong. The "deliberately elicited" test has been a guiding principle of the Sixth Amendment right to counsel for nearly a quarter century, and there is no cause to believe it suddenly should not apply in this case. If the members of the majority believe *Maine v. Moulton, supra,* permits a different standard, they should read *Kuhlmann v. Wilson, supra:*

> As our recent examination of the Sixth Amendment issue in *Moulton* makes clear, the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. . . . [To make out a violation of the right to counsel,] the defendant must demonstrate that the police . . . took some action, beyond merely listening, that was *designed deliberately to elicit incriminating remarks.*

(Italics mine.) *Wilson,* at 459. This passage did not speak merely for a majority of the Supreme Court; the Court unanimously agreed that the Sixth Amendment right is not

---

[12]The Supreme Court recently described this test as follows: "[O]nce a defendant's Sixth Amendment right to counsel has attached, he is denied that right when [police] 'deliberately elicit' incriminating statements from him in the absence of his lawyer." *Kuhlmann v. Wilson,* 477 U.S. 436, 457, 91 L. Ed. 2d 364, 106 S. Ct. 2616 (1986).

violated unless police "deliberately elicit" incriminating statements from a defendant who speaks without the assistance of counsel. *See Wilson,* at 461 (Burger, C.J., concurring), 473–76 (Brennan, J., dissenting), 476–77 (Stevens, J., dissenting).

Under the proper "deliberately elicited" test, Sargent's right to counsel clearly was not violated.[13] Bloom did nothing, "beyond merely listening", to elicit Sargent's confession. *Wilson,* at 459. Indeed, Bloom's conduct seems even more clearly consistent with the Sixth Amendment than the police conduct approved by the Supreme Court in *Wilson.*

Having been seen fleeing from a taxi garage immediately after a robbery and murder had occurred therein, Wilson surrendered to police, admitting he was at the garage when the crimes occurred, but claiming he was innocent and had fled for fear of being wrongly accused. After arraignment, police confined Wilson in a cell with another prisoner who, unbeknownst to Wilson, earlier had agreed to act as a police informant. By strange coincidence, the cell overlooked the garage where the crimes had occurred. After observing the garage through his cell window, Wilson began to discuss the crimes with the cell mate/informant. The informant asked no questions of Wilson, but expressed disbelief as to Wilson's initial claim of innocence. For several days, the informant surreptitiously took notes while Wilson steadily changed his story and finally confessed. The Supreme Court held that Wilson's right to counsel was not violated because the police had not "deliberately elicited" his confession.

---

[13]I base my conclusion solely on the view that Sargent's confession was not "deliberately elicited" by Bloom, though I believe it plausible also that Bloom's postconviction interview was not a "critical stage" of the proceedings and thus that Sargent did not even have a right to counsel. *See Brown v. Butler,* 811 F.2d 938, 940–41 (5th Cir. 1987); *Baumann v. United States,* 692 F.2d 565, 577–78 (9th Cir. 1982); *Cahill v. Rushen,* 678 F.2d 791, 796–806 (9th Cir. 1982) (Wallace, J., dissenting).

Like Wilson, Sargent was in custody at the time he confessed. And as happened to Wilson, Sargent was told by his "interrogator" that his claim of innocence was not credible. Unlike Wilson, however, Sargent did not confess to a secret informant who clandestinely recorded his statements over several days.[14] Nor did he gaze over the scene of his crime while Bloom waited for a confession to issue. These distinctions make Sargent's Sixth Amendment claim weaker than the one the Court rejected in *Wilson.*

### CONCLUSION

Sargent's confession was not compelled by the police in violation of his Fifth Amendment privilege against self-incrimination. Nor was it "deliberately elicited" in violation of his Sixth Amendment right to counsel. Thus, the convictions should be affirmed.

CALLOW, J., concurs with DURHAM, J.

Reconsideration denied January 13, 1989.

---

[14]As Justice Brennan noted in dissent, conversation between a defendant and a secret informant is more likely to elicit incriminating information than conversation between a defendant and someone the defendant knows to be a government agent. *Wilson,* at 475 (Brennan, J., dissenting).