[No. 20788-1-I.  Division One.  June 12, 1989.]

THE STATE OF WASHINGTON, *Respondent*, v. GORDON
MICHAEL STRAUSS, *Appellant*.

*Dawn Monroe* of *Washington Appellate Defender Association*, for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Donna L. Wise, Deputy,* for respondent.

SCHOLFIELD, J.—Gordon Michael Strauss appeals his exceptional sentence for conviction of second degree rape.

## FACTS

Strauss, who had been on parole for approximately 1 month, was charged with committing rape in the second degree upon P.G. on October 12, 1986. The incident took place on a Sunday, between 7:15 a.m. and 8:15 a.m. P.G. left her home that morning to jog on a trail surrounding the Safeco complex in the Redmond area.

As P.G. began to jog around the track, she noticed two cars in the parking lot, and assumed they belonged to people coming to work. As P.G. turned a corner on the trail, she observed an American–make, white, unmarked car with a door open, and noticed that a male dressed in dark slacks and a dark jacket was approaching her from about 7 feet away. P.G. thought at first that the man, whom she identified at trial as Strauss, was a police officer, based on seeing the white car and what appeared to her to be a police uniform.[1] P.G. testified that she thought there was possibly something on the trail about which the guard or officer needed to tell her. She slowed down for Strauss to catch up with her. After she asked him what he wanted, Strauss grabbed her by the left arm and said, "If you cooperate, you won't get hurt." P.G. tried to break his grasp and yelled at Strauss to take his hands off her, but Strauss grabbed her by the throat and told her that she had better do what he said, because her life depended on it.

Strauss pulled P.G. off the trail and told her that he was going to rape her, because that was what she had been waiting for. P.G. attempted to dissuade Strauss, telling him that the trail was well traveled. Strauss responded, "You are meeting someone here. I will take you in my car." P.G. told him that she was not meeting anyone, but repeated that the area was well traveled.

Strauss responded by taking P.G.'s arm and pulling her toward his car. P.G. grabbed a nearby fence to stop him. Strauss pushed P.G. to the ground, straddled her chest and began to pull her clothes off. Strauss then exposed his penis, and told P.G. that her life depended on her manipulating his penis to help him "get it up." Strauss put his mouth on P.G.'s breasts, and then ordered her to suck his penis.

---

[1]The State produced dark slacks and a dark jacket taken from Strauss' apartment that P.G. positively identified at trial. Neither item had any emblem or other identifying mark. The State also presented testimony that Strauss had worked as a security guard in the past.

Strauss next asked P.G. if his penis was hard enough to put inside her, and told her that it had better be, because her life depended on it. Strauss then forced his penis into her vagina. After approximately 5 minutes of sexual intercourse, Strauss removed himself. He told P.G. to hold her running shorts over her face so that she could not see him leave. P.G. waited a few minutes and then got dressed. She looked for Strauss and the car, but both were gone. P.G. then ran to the Redmond police station to report the rape.

After a jury trial, Strauss was found guilty as charged. Although the State first argued that Strauss had an offender score of 4, based on a 1978 California rape charge and a Washington assault in the second degree charge, the trial court did not count the 1978 charge because it was statutory rape of a 17–year–old, which is not a crime in Washington. Thus, with an offender score of 2, the standard range for this rape in the second degree conviction was 31 to 41 months. However, the trial court decided that an exceptional sentence was warranted, and sentenced Strauss to 120 months.

The trial court entered findings of fact and conclusions of law as required by RCW 9.94A.120(3),[2] in pertinent part as follows:

### FINDINGS OF FACT

1) That the defendant's conduct during the commission of the crime manifested deliberate and extreme cruelty to the victim within the meaning of RCW 9.94A.390 in that the defendant threatened to kidnap the victim and also choked her[.] [T]hese acts are not charged in the Rape in the second degree herein.

2) That the defendant's current offense involved a high degree of sophistication or planning in that he attacked two other women at the same site prior to this rape and attacked yet another in the months to follow.

---

[2]RCW 9.94A.120(3) provides that:

"Whenever a sentence outside the standard range is imposed, the court shall set forth the reasons for its decision in written findings of fact and conclusions of law. . . ."

3) The defendant used his position of trust [and] confidence to facilitate the commission of the crime. This is based upon facts in the record that the defendant wore a security guard outfit during the attack and approached the victim from a vehicle that closely resembled a police car and the defendant during trial was intensely menacing toward the victim while she was testifying. This witness was very fearful as he stared coldly and intently at her. This was observed by the Court. This defendant appears dangerous on observation. . . .

### CONCLUSIONS OF LAW

. . .

1) That the following aggravating factors are present under RCW 9.94A.390: RCW 9.94A.390(2)(a); RCW 9.94A.390(2)(c)(iii); and RCW 9.94A.390(2)(c)(iv).

2) That beyond these factors, the court finds that the public would not be adequately protected by the imposition of the presumptive range. The court feels that the defendant is extremely dangerous and that his prior conduct supports the need for a longer sentence. The court makes this finding based upon the fact that the defendant had been imprisoned previously for rape and committed this offense within one month of release.

The trial court based the first finding on P.G.'s testimony regarding the circumstances of the rape. The trial court based the second finding on the State's offer of proof during the trial—that Strauss had attacked two women in 1982. According to the State's offer, Strauss met two young women at a bus stop in Juanita, and took them home with him. Strauss eventually pulled a knife on one of the women and raped her several times. He then took her to the area near where P.G. was attacked, although the buildings now there were not yet built. Strauss raped the young woman repeatedly at this location. Strauss was arrested and charged on several counts, but the victim became so traumatized she could not testify, so those counts were dismissed. In addition, the State's offer showed that while he was awaiting trial on those counts, before their dismissal, Strauss attempted to sexually assault a woman jogger at the same location, but she escaped when they were

approached by a car and driver. Strauss was convicted of second degree assault for the second incident.

The State also made an offer of proof regarding an incident involving Strauss several months after the attack upon P.G. According to the State, on January 10, 1987, Dr. Liz Jensen, an eastside Group Health Hospital employee, was jogging around the Safeco complex when she observed a mustard–colored Plymouth. The driver, whom Jensen later identified as Strauss, followed her as she jogged and asked her, "How about a little sex?" The trial court had ruled that the evidence concerning the three incidents would not be admissible under ER 404(b).

The trial court based its third finding (that Strauss abused a position of trust) on his making P.G. believe that he was a police officer or security guard. In addition, the court's third finding indicated that Strauss appeared to be intensely menacing to P.G. at trial, and that he appeared dangerous upon observation as the court watched him during trial.[3]

Strauss, through his attorney, objected to the court's consideration for sentencing purposes of any information aside from evidence produced at trial, P.G.'s statement as to how the rape affected her, and the fact of his second degree assault conviction. Specifically, Strauss objected to the court's consideration of the underlying facts of the assault conviction or the facts of any other incident.

## EXCEPTIONAL SENTENCE

Strauss argues that none of the trial court's findings justify an exceptional sentence. Strauss contends that finding 1 relied on facts constituting uncharged additional crimes. Strauss argues that finding 2 was based on facts not proven at trial or sentencing. Strauss further argues that the trial court mischaracterized the relationship between himself

---

[3]At the sentencing hearing, Strauss' parole officer testified and apparently provided the trial court with a presentence report. That report is not contained in the record on appeal. It is unclear whether or to what extent the trial court relied on the report.

and P.G. by finding a position of trust, and that finding 3 also penalized him for exercising his right of confrontation. Strauss also argues that conclusion of law 2 represented the trial court's subjective impressions, which are not supported by the record.

RCW 9.94A, the Sentencing Reform Act of 1981 (SRA), was enacted by the Legislature to make the criminal justice system accountable to the public. It is a system which structures, but does not eliminate, discretionary decisions by trial courts. See RCW 9.94A.010.[4] RCW 9.94A.120 sets forth general sentencing guidelines as follows:

> Sentences. When a person is convicted of a felony, the court shall impose punishment as provided in this section.
>
> (1) Except as authorized in subsections (2), (5), and (7) of this section, the court shall impose a sentence within the sentence range for the offense.
>
> (2) The court may impose a sentence outside the standard sentence range for that offense if it finds, considering the purpose of this chapter, that there are substantial and compelling reasons justifying an exceptional sentence.
>
> (3) Whenever a sentence outside the standard range is imposed, the court shall set forth the reasons for its decision in written findings of fact and conclusions of law. A sentence outside the standard range shall be a determinate sentence.

RCW 9.94A.390 sets forth certain "aggravating factors" that the court may consider in deciding to impose an exceptional sentence greater than the standard range for the crime. The factors are illustrative and not exclusive. That statute reads in pertinent part:

> (2) Aggravating Circumstances
> (a) The defendant's conduct during the commission of the current offense manifested deliberate cruelty to the victim.
>
>     . . .
> (c) . . .

---

[4]This statute lists (a) proportionality, (b) just punishment, and (c) protection of the public as several of the purposes of the chapter.

. . .

(iii) The current offense involved a high degree of sophistication or planning or occurred over a lengthy period of time;

(iv) The defendant used his or her position of trust, confidence, or fiduciary responsibility to facilitate the commission of the current offense.[5]

In making its decision regarding the appropriate sentence to impose, the trial court is limited as to the information it may rely on. RCW 9.94A.370 provides in pertinent part:

(2) In determining any sentence, the trial court may rely on no more information than is admitted by the plea agreement, or admitted, acknowledged, or proved in a trial or at the time of sentencing. Acknowledgement includes not objecting to information stated in the pre-sentence reports. Where the defendant disputes material facts, the court must either not consider the fact or grant an evidentiary hearing on the point. The facts shall be deemed proved at the hearing by a preponderance of the evidence. Facts that establish the elements of a more serious crime or additional crimes may not be used to go outside the presumptive sentence range except upon stipulation . . .

RCW 9.94A.210 provides for review of an exceptional sentence as follows:

(2) A sentence outside the sentence range for the offense is subject to appeal by the defendant or the state. The appeal shall be to the court of appeals in accordance with rules adopted by the supreme court.

. . .

(4) To reverse a sentence which is outside the sentence range, the reviewing court must find: (a) Either that the reasons supplied by the sentencing judge are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.

---

[5]The statute applies the sophistication and planning or position of trust factors only to major economic offenses or violation of the Uniform Controlled Substances Act. *See* RCW 9.94A.390(2)(c), (d). However, Washington courts have applied the factors more generally.

(5) A review under this section shall be made solely upon the record that was before the sentencing court. . . .

██ The Washington Supreme Court in *State v. Nordby*, 106 Wn.2d 514, 723 P.2d 1117 (1986) set forth the proper method of inquiry for the appellate court reviewing an exceptional sentence under RCW 9.94A.210(4)(a).[6] Initially, the appellate court must make the determination of whether the sentencing judge's reasons for imposing an exceptional sentence are supported by the record. This is a factual determination, and the trial court will not be reversed unless its reasons are clearly erroneous. The appellate court must then determine whether, as a matter of law, the sentencing judge's reasons are substantial and compelling, to justify imposition of an exceptional sentence. *Nordby,* at 517–18.

An examination of the trial court's findings of fact and conclusions of law for exceptional sentences before us indicates that the court based its sentencing decision on four grounds: (a) deliberate cruelty, (b) sophistication and planning, (c) abuse of a position of trust, and (d) future dangerousness. This court must determine whether these reasons are supported by the record, and if so, whether the reasons are substantial and compelling to impose an exceptional sentence.

In *State v. Payne,* 45 Wn. App. 528, 726 P.2d 997 (1986), the defendant pleaded guilty to assault in the second degree after being charged with rape in the first degree, for driving his victim to a remote area and threatening to kill her if she did not have sex with him. On appeal, the *Payne* court rejected the trial court's finding of deliberate cruelty because the finding was insufficiently specific, such that the appellate court could not determine whether the cruelty was "'of a kind not usually associated with the commission

---

[6]Nordby did not argue, pursuant to RCW 9.94A.210(4)(b), that his sentence was clearly excessive, and neither does Strauss. Therefore, we do not consider whether his 120–month sentence was excessive.

of the offense in question.'" *Payne,* at 531 (quoting *State v. Schantzen,* 308 N.W.2d 484, 487 (Minn. 1981)).

In *State v. Dennis,* 45 Wn. App. 893, 728 P.2d 1075 (1986), *review denied,* 108 Wn.2d 1008 (1987), the trial court based an exceptional sentence for first degree rape and first degree kidnapping on the defendant's deliberate cruelty. While refusing to adopt the State's proffered "deliberate cruelty" definition of "conduct which inflicts physical, psychological or emotional pain as an end in itself", the *Dennis* court held that an exceptional sentence was justified in the case before it, based on multiple penetrations and that the crime was in the nature of a "gang rape". *Dennis,* at 896–97.

In *State v. Holyoak,* 49 Wn. App. 691, 745 P.2d 515 (1987), *review denied,* 110 Wn.2d 1007 (1988), the defendant was convicted of first degree assault. He had choked the victim, threatened to kill her, struck her with his fists, repeatedly struck her head with a block of concrete, and pounded her head on the pavement as he attempted, but did not succeed, in raping her. The *Holyoak* court noted that no definition of "deliberate cruelty" had been adopted in Washington, and also declined to do so, but stated that where a defendant's conduct includes gratuitous violence and is significantly more serious or egregious than typical, then an exceptional sentence is justified. *Holyoak,* at 696. The *Holyoak* court held that the repetitive striking and the strangulation were gratuitous, and thus sufficient to justify an exceptional sentence.

In *State v. Altum,* 47 Wn. App. 495, 735 P.2d 1356, *review denied,* 108 Wn.2d 1024 (1987), an exceptional sentence was imposed for deliberate cruelty in the commission of rape in the first degree and robbery in the second degree. The trial court's findings indicated:

> That the crimes committed against the victim were excessively violent and brutal, involving repeated acts of forcible intercourse, humiliation, physical assault, and degradation. . . . [She] was subjected to attack

simultaneously by both the defendant and co–defendant . . . [T]he victim was left naked and bleeding to crawl from the vehicle in a remote area in the middle of the night. The attack . . . included threats against the life of the victim and her family, and [the attack persisted] for a period of time in excess of three hours.

*Altum,* at 502.

In *State v. Falling,* 50 Wn. App. 47, 747 P.2d 1119 (1987), a prosecution for rape in the first degree, the defendant broke into the victim's apartment while she was asleep, held a knife to her, forced her to engage in vaginal and oral intercourse for a 30–minute period, and threatened to kill her if she resisted or screamed. On appeal, the *Falling* court upheld an exceptional sentence, stating that the threats, the multiple penetrations, and the demonstrated contempt for the victim justified the exceptional sentence. *Falling,* at 55.

■ Although the *Dennis* and *Holyoak* courts set forth definitions of deliberate cruelty, neither these courts nor any other Washington court has adopted a definition of deliberate cruelty.[7] We believe the best definition would be one which combines elements of the definitions set forth in *Dennis, Holyoak,* and *Payne* as follows:

Deliberate cruelty consists of gratuitous violence, or other conduct which inflicts physical, psychological or emotional pain as an end in itself.

Applying the above definition to the facts before us, we do not believe that the trial court's finding that Strauss engaged in deliberate cruelty can be upheld. The conduct at issue consists of holding P.G. by the throat (not necessarily "choking" as set forth in the findings), and telling P.G. that it was worth her life to cooperate. However, Strauss' conduct was not *gratuitous* violence, but rather was for the purpose of exacting compliance from P.G. Strauss did not strike her or inflict additional injuries other than the rape. Rape in the second degree requires forcible compulsion,

---

[7]For the most part, the facts in these cases have been so egregious that a limiting definition would seem unnecessary.

and we find that Strauss' conduct was of the type normally associated with this crime.

The State argues that because Strauss penetrated P.G. more than once, the trial court was correct in making a finding of deliberate cruelty. Multiple penetrations have been used as a ground for a finding of deliberate cruelty in *Dennis* and *Falling*. However, these two cases can be distinguished on their facts. In *Dennis,* the victim was raped by more than one person after she had been kidnapped and threatened with a handgun. The multiple penetrations took place over a protracted period of time. In *Falling,* the defendant broke into the victim's apartment in the middle of the night, threatened her with a knife, and engaged in oral and vaginal intercourse for a 30–minute period. In contrast, Strauss was the only perpetrator and his conduct was much more time limited. Therefore, we hold that the trial court's finding of deliberate cruelty was clearly erroneous.

Strauss also argues that the acts relied on by the trial court to find deliberate cruelty constitute additional uncharged crimes, and pursuant to RCW 9.94A.370(2), may not be relied upon for an exceptional sentence. Strauss' argument is without merit. The evidence before the court would not support a charge of rape in the first degree, nor would it be appropriate to charge a separate assault in addition to the second degree rape.

The trial court also relied on the notion that the crime involved sophistication and planning on Strauss' part. The court's findings state that the sophistication was apparent because Strauss attacked two women prior to this rape and accosted one woman after the rape in the same location. However, the State argues that the finding of sophistication came from Strauss' adoption of the appearance of a security guard. The record does not support either inference. Attacking more than one victim at the same location does not necessarily show sophistication. However, even if the nature of Strauss' attacks showed some level of sophistication, the trial court cannot rely upon the State's

offer of proof of these incidents in the face of Strauss' denial. RCW 9.94A.370 requires the holding of an evidentiary hearing, which was not done in this case.

As for the State's argument that Strauss showed a high degree of sophistication warranting an exceptional sentence because he appeared to dress as a security guard, we believe the record also does not support this contention. While P.G. testified that she initially thought that Strauss was a police officer or a security guard, the white car he was using had a handicapped license plate, not a city plate. Strauss was wearing dark pants and, apparently, his former security guard uniform jacket. However, there was no insignia or other identifying mark on the clothing, Strauss did not wear an officer's cap, and he did not in any way indicate to P.G. that he was a security guard. This compels the conclusion that there was insufficient evidence of sophistication and planning here to justify an exceptional sentence.

The trial court also found that Strauss abused a position of trust by posing as a security guard and attempting to gain P.G.'s confidence. In *State v. Fisher*, 108 Wn.2d 419, 739 P.2d 683 (1987), the defendant was convicted of two counts of indecent liberties upon the same victim. The trial court imposed exceptional sentences on both charges. One of the grounds set forth by the trial court to support the giving of the exceptional sentences was that the defendant placed himself in a position of trust and confidence with the victim in order to facilitate the commission of the crimes. Fisher had spent time playing at a neighborhood pool with the victim and several other children, and eventually volunteered to accompany the victim to the restroom, where the attacks occurred.

On appeal, the *Fisher* court questioned whether the trust relationship was significant enough to be considered a substantial and compelling reason for an exceptional sentence. Because the other grounds listed were sufficient to justify the exceptional sentence, the *Fisher* court declined to decide the significance of the trust factor. However, in dicta, the *Fisher* court noted that the defendant had

become acquainted with the victim only a few days before the incidents occurred and that a relationship extending over a longer period of time, or one within the same household, would create more of a trust relationship, providing a substantial reason for the exceptional sentence. *Fisher*, at 427.

Similarly, in *State v. Gonzales*, 46 Wn. App. 388, 731 P.2d 1101 (1986), the Court of Appeals reversed the trial court's finding that Gonzales was in a position of trust or confidence based on the notion that his grandmother and other members of his family had worked for the burglary victim in the past. *Gonzales*, at 405. On the other hand, in *State v. Davis*, 47 Wn. App. 91, 734 P.2d 500, *review denied*, 108 Wn.2d 1029 (1987), the Court of Appeals upheld the trial court's finding that the defendant, who had been painting the victim's house for several days prior to an assault, had abused his position of trust by getting the victim to open her front door to allow him entry into her home. *Davis*, at 97.

We do not believe that the evidence before us supports a finding that Strauss abused a position of trust. Prior to the rape, Stauss had had no contact with P.G. He was neither a friend nor an acquaintance. As Strauss argues, there was no relationship between the two that would facilitate the commission of the rape. While it is certainly possible that Strauss or any other rapist might be found to have presumed upon a position of trust by posing as a security guard or police officer and enticing a woman into a secluded area, the evidence that Strauss was attempting to pose as a security guard is limited at best. The trial court's finding that Strauss abused a position of trust is clearly erroneous.

The last reason relied upon by the trial court in imposing the exceptional sentence was future dangerousness. In *State v. Olive*, 47 Wn. App. 147, 734 P.2d 36, *review denied*, 109 Wn.2d 1017 (1987), the defendant was charged with simple assault and unlawful imprisonment of two young girls. He pleaded guilty and received an exceptional

sentence for the unlawful imprisonment. The defendant argued, *inter alia,* that predicted future dangerousness was an improper basis for an exceptional sentence and that the court erred in relying on disputed facts without holding an evidentiary hearing.

The defendant, Olive, relied on *State v. Payne,* 45 Wn. App. 528, 726 P.2d 997 (1986), for the proposition that predicted future dangerousness is an improper basis for an exceptional sentence. However, the *Olive* court noted that the full *Payne* holding was that the court should not rely *solely* on an offender's personality or predicted dangerousness "without any history of similar acts or other corroborating evidence . . ." (Italics omitted.) *Olive,* at 150 (quoting *Payne,* at 533).

In *State v. Woody,* 48 Wn. App. 772, 742 P.2d 133 (1987), *review denied,* 110 Wn.2d 1006 (1988), a prosecution for indecent liberties, the trial court sentenced the defendant to greater than the standard range, finding, *inter alia,* that there was a serious likelihood that he would reoffend. In affirming the sentence based in part on this reasoning, the *Woody* court noted that the trial court may enhance a sentence for future dangerousness, based on a history of similar acts or other corroborating evidence, although the trial court's "subjective determination" that the standard range is inadequate because it does not advance the goals of the SRA is not sufficient. *Woody,* at 780. *See also State v. Pascal,* 108 Wn.2d 125, 736 P.2d 1065 (1987).

The trial court below stated in its findings and conclusions that Strauss appeared dangerous on observation and that he stared coldly and intently at P.G. when she testified. As Strauss properly argues, these observations are not objective in nature, and cannot be used to support an exceptional sentence. However, the facts alleged by the State concerning Strauss' other acts, if proven, could support a finding of future dangerousness, which in turn could

be a substantial and compelling reason for imposing an exceptional sentence—that is, for protection of the public.[8]

The trial court was apparently relying on either the State's argument during motions in limine or the State's offer of proof during the trial concerning the prior acts and the harassment of the doctor after this rape was committed, to support its finding of future dangerousness. In the absence of proof rising to the level of a preponderance, the trial court cannot consider these other acts. The State concedes that these other acts should not have been considered without an evidentiary hearing. *See State v. Wood,* 42 Wn. App. 78, 709 P.2d 1209 (1985), *review denied,* 105 Wn.2d 1010 (1986). The State argues that the proper remedy for failure to hold the evidentiary hearing is a remand to enable that hearing to take place, rather than a remand for sentencing within the standard range. We agree that the State's suggestion is the proper remedy for the trial court error here.

The exceptional sentence is reversed, and this case is remanded to the trial court for resentencing after the court conducts the proper evidentiary hearing concerning the other three sexual offenses contained in the State's offer of proof.

SWANSON and WINSOR, JJ., concur.

Reconsideration denied July 26, 1989.

---

[8]Strauss argues that the SRA's "real facts" policy prevents the trial court from considering any uncharged acts. However, the trial court would be examining these incidents not for the purpose of punishing Strauss for uncharged crimes, but rather, to ascertain if a pattern of deviant acts exists.