[No. 23304–1–I.   Division One.   October 8, 1990.]

THE STATE OF WASHINGTON, *Respondent,* v. CHARLES WILLIAM POST, *Appellant.*

*James E. Lobsenz* and *Carney, Stephenson, Badley, Smith & Spellman,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Jonathan Love, Deputy,* for respondent.

BAKER, J.—Charles William Post was convicted of burglary in the first degree, RCW 9A.52.020 (count 1), and rape in the first degree, RCW 9A.44.040 (count 2). Post claims 11 assignments of error which may be grouped into two categories: (1) did the trial court err in denying Post's motion for mistrial based upon allegedly improper testimony from a witness for the State; and (2) did the trial court err in sentencing Post to a term outside the standard range.

I

FACTS

M, then 15, awoke in her bedroom to find a strange man standing above her. The man was wearing a ski mask and a dark coat and pants. He put his hand over M's mouth. M tried to scream but the man shoved her against the wall and choked her. He removed her underwear and told her to

take off her shirt. He put the shirt over M's face, lodging part of it in her mouth to muzzle her. He then placed a knife against her throat.

The man ordered M to assume various positions before he was able to achieve penetration. Though her face was covered, M felt him take off his mask and could feel his face against her skin. She noticed he had facial hair.

When the man left the bedroom, M ran to the phone to call for help. The man returned, however, again wearing the ski mask, and pulled the cord from the phone. He shoved M back onto her bed and told her he was going upstairs and that he would be back. She stayed on the bed for nearly an hour. She then put on some clothes, armed herself with scissors, climbed out her window, and ran to a neighbor's house for help.

On the morning of the rape, a neighbor observed a bearded man wearing a short jacket and carrying a camera bag walk out of the driveway of M's residence. He thought the man looked suspicious, so he noted the license plate number of the car the man drove. When later shown a photo montage which included a picture of Post, the neighbor picked Post's photo and said he was 80 percent sure the man pictured was the person he had seen in M's driveway.

The license plate was traced and the car was found to belong to a roommate of Post's girl friend. She testified that on the evening prior to the rape, she and Post went to a party which lasted into the following morning. Sometime around 4 or 5 a.m. she gave Post the keys to her car so he could go home.

Post's girl friend testified that on the morning of the rape Post arrived at her apartment. When asked where he had gone after leaving the party, Post explained that he had driven to Tacoma to see a friend, but that the friend was not home. She also testified that sometime later Post told her that if the police came around asking whether he had driven her roommate's car, she should say no.

Human hairs found on M's bedsheet were analyzed and compared to samples taken from Post. Seven of the 15

hairs found were determined to have the same microscopic characteristics as those belonging to Post. Sperm found on a vaginal swab taken from M was determined to be consistent with having come from Post. About 30 percent of all men share these same secretion characteristics.

Post did not testify. The defense theory was one of mistaken identity and alibi. Post was charged with one count of first degree burglary and one count of first degree rape. A motion to amend the information, adding a deadly weapon allegation to each count, was granted on the first day of trial. The jury found Post guilty on the rape and burglary charges, but returned verdicts of not guilty with regard to the deadly weapon counts. The trial court subsequently entered an exceptional sentence nearly twice that of the top of the standard range. This appeal followed.

## II
### PROCEDURAL HISTORY

Prior to trial the State brought a motion in limine to exclude any defense references to other suspects. The State provided the following argument in support of its motion:

> I don't think there should be any questioning about other suspects unless somehow the State opens the door to testimony about it. We don't intend to elicit any testimony whatsoever from any witness about other suspects, how they got to Mr. Post, or anything like that.
>
> That obviously cuts both ways, because the way they did get there is because of a relative of the defendant calling the police and saying, "Hey, you have to check this guy out." I suppose Mr. Leen doesn't want that coming in.
>
> The State won't offer any evidence of other suspects, period, through any witness. So I would expect, given that, that the Court should grant the State's motion in limine, and if Mr. Leen feels we open the door, we could have a sidebar.

An extended argument followed and it does not appear that the court specifically ruled on the motion. However, it may be gleaned from the colloquy that the parties understood the court would not permit reference to any particular suspect, and that the State would not elicit testimony as to how the police came to suspect Post in the rape.

## III
### MOTION FOR MISTRIAL

As part of its case in chief the State called Detective James Constantine of the Bellevue Police Department. During direct examination the following exchange took place:

Q. At some point, did your investigation focus or narrow on Charles Post?

A. Yes, it did.

Q. How is it you became aware of Mr. Post?

MR. LEEN: Judge, objection. Calls for hearsay.

THE COURT: Overruled.

Q. (By Mr. O'Leary): You can answer.

A. *We became aware of Mr. Post from a telephone information call from an individual who gave us his name.*

MR. LEEN: Judge, can I ask for a sidebar?

THE COURT: Yes.

(Sidebar)

THE COURT: Members of the jury, you're instructed to disregard the last answer by the officer relating to a telephone call. You must disregard that answer. You may proceed.

(Italics ours.)

At the following recess Post moved for a mistrial, claiming the testimony was hearsay, prejudicial, and contrary to the State's pretrial assurances that such evidence would not be elicited. In addition, Post reasons on appeal that the trial court's failure to grant a mistrial was error because the testimony violated both his constitutional right to confront the witness[1] and, as an expression of the caller's opinion that Post was the rapist, his constitutional right to a jury trial.[2] Post further argues that notwithstanding the court's instruction to disregard it, the testimony was so prejudicial that he was denied a fair trial. We disagree.

The challenged testimony was not hearsay. It was not offered for the truth of what the caller said; rather, it is

---

[1]*See Ohio v. Roberts,* 448 U.S. 56, 66, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980) (where hearsay is admitted without the State showing either that the declarant is unavailable or that the statement bears the adequate indicia of reliability, admission of the hearsay evidence violates the confrontation clause).

[2]*See State v. Carlin,* 40 Wn. App. 698, 700 P.2d 323 (1985).

clear when viewed in context that the testimony was offered to establish why the detective acted as he did.

■ Moreover, a trial judge has wide discretion in curing irregularities which occur during trial. *State v. Gilcrist,* 91 Wn.2d 603, 612, 590 P.2d 809 (1979); *State v. Swenson,* 62 Wn.2d 259, 276, 382 P.2d 614 (1963). The standard of review in this regard is abuse of discretion. *State v. Weber,* 99 Wn.2d 158, 166, 659 P.2d 1102 (1983).

■■ Even assuming that this testimony violated the agreement of the parties in limine, it does not necessarily follow that a mistrial should be ordered when the jury is properly instructed to disregard.

> The law presumes, and must presume, that the jury finds the facts from the evidence the court permits them to consider. Any other rule would render the administration of the law impractical.

*State v. Priest,* 132 Wash. 580, 584, 232 P. 353 (1925), *quoted with approval in State v. Johnson,* 60 Wn.2d 21, 29, 371 P.2d 611 (1962). We presume that the jury followed the trial court's instruction to disregard Detective Constantine's remark and did not consider it as evidence before it. *Weber,* 99 Wn.2d at 166; *State v. Mak,* 105 Wn.2d 692, 702, 718 P.2d 407, *cert. denied,* 479 U.S. 995, 93 L. Ed. 2d 599, 107 S. Ct. 599 (1986). The Supreme Court has adopted the following standard for reviewing trial irregularities:

> A mistrial should be granted only when "nothing the trial court could have said or done would have remedied the harm done to the defendant." In other words, a mistrial should be granted only when the defendant has been so prejudiced that nothing short of a new trial can insure that defendant will be tried fairly. Only those errors which may have affected the outcome of the trial are prejudicial.

(Citations omitted.) *State v. Gilcrist,* 91 Wn.2d at 612.

Post relies primarily upon *State v. Miles,* 73 Wn.2d 67, 436 P.2d 198 (1968). However, *Miles* and the other cases cited by Post are inapposite. In *Miles,* a similar question was asked on direct examination. The response was that police attention had been drawn to the defendant by a police teletype which described two wanted suspects in an

identified car headed for Spokane to duplicate a robbery committed in Grandview. The court did reverse, despite the trial court's admonition to the jury to disregard the testimony. However, the court's focus was upon the prejudicial effect of testimony relating to another uncharged serious crime. No such factor is present in this case.

The appropriate inquiry in this case is whether Detective Constantine's testimony, when viewed against the backdrop of all the evidence, so tainted the entire proceeding that Post did not receive a fair trial. *Weber,* 99 Wn.2d at 164. We have read and considered the record carefully and conclude, as did the trial court, that the detective's statement did not deprive Post of a fair trial. After a timely sidebar, the jury was immediately instructed to disregard the answer. No further reference to the telephone information call was made. The trial court did not abuse its discretion in denying Post's motion for mistrial.

## IV
### SENTENCING

Post contends that the trial court erred by sentencing him to a term beyond the standard range. The trial court may impose a sentence outside the standard range if it finds there are "substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.120(2). The Sentencing Reform Act of 1981 provides an illustrative, nonexclusive list of mitigating and aggravating circumstances which the court may consider in imposing an exceptional sentence. RCW 9.94A.390.[3] Appellate review of an exceptional sentence is made solely upon the record before the sentencing court. RCW 9.94A.210(5).

> To reverse a sentence which is outside the sentence range, the reviewing court must find: (a) Either that the reasons supplied by the sentencing judge are not supported by the record which was before the judge or that those reasons do not justify

---

[3]RCW 9.94A.390 reads in pertinent part:

"(2) Aggravating Circumstances

"(a) The defendant's conduct during the commission of the current offense manifested deliberate cruelty to the victim."

a sentence outside the standard range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.[4]

RCW 9.94A.210(4).

■ Whether the trial court's reasons for imposing an exceptional sentence are supported by the record requires a factual determination. It must then be determined, as a matter of law, whether these reasons are "substantial and compelling", thereby justifying imposition of the exceptional sentence. Unless its reasoning is clearly erroneous, the trial court will not be reversed. *State v. Nordby,* 106 Wn.2d 514, 517–18, 723 P.2d 1117 (1986); *State v. Strauss,* 54 Wn. App. 408, 416, 773 P.2d 898 (1989).

Whenever an exceptional sentence is imposed, the trial court shall set forth the reasons for its decision in written findings of fact and conclusions of law. RCW 9.94A.120(3). In the present case, the trial court provided the following reasons for imposing an exceptional sentence:

### I. FINDINGS OF FACT

The court in making these findings of fact considered the following information: 1) PreSentence report of Prosecuting Attorney, 2) PreSentence report of Defense, 3) PreSentence report of Dept. of Corrections, 4) Testimony of Tom Porro, 5) Testimony of Dr. Brett Trowbridge and the information contained within the court file (attached as part of the record) 6) letters from victim and family and letters of support for the defendant.

1) The defendant was on active parole at the time of the commission of this offense.

2) The nature of this rape was predatory, planned and symptomatic of future dangerousness. Since the prior convictions established the same pattern.

3) This crime coupled with his two other Rape 1 convictions establish that the defendant is exceptionally dangerous and likely to reoffend.

4) The testimony of Dr. Trowbridge established the defendant is not amenable to treatment and that he has little insight into his sexual deviance.

5) The rapidity of the commission of the present crimes in conjunction with his release from the penitentiary (4 months)

---

[4]Post does not argue that his sentence was clearly excessive. Therefore, for purposes of this case, the relevant portion of RCW 9.94A.210(4) is subsection (a).

demonstrate that society needs an adequate measure of safety beyond the standard range.

6) The rape occurred in [M's] bedroom.

7) The length of these offenses lasted nearly an hour in duration.

8) The defendant attempted multiple penetrations of the victim during the commission of this offense.

## II. CONCLUSIONS OF LAW

Pursuant to [RCW] 9.94A.120(2) and [RCW] 9.94A.390(2)(a) and *State v. Falling,* [50 Wn. App. 47, 747 P.2d 1119 (1987)] and *State v. Woody,* [48 Wn. App. 772, 742 P.2d 133 (1987), *review denied,* 110 Wn.2d 1006 (1988)] and *State v. Tunnell,* [*sic*] [51 Wn. App. 274, 753 P.2d 543, *review denied,* 110 Wn.2d 1036 (1988)], the court concludes these are substantial and compelling reasons to justify an exceptional sentence of 180 months on Cts. 1 and 2.

■ The court concludes that the defendant's conduct during the offense manifested deliberate cruelty toward the victim. [2] The court further concludes that this rape constituted an invasion of the victims [*sic*] "zone of privacy". [3] The court also concludes that the defendant is a clear and present and future danger to the community; [4] the protection of the public requires a sentence beyond the standard range.

### A. Deliberate Cruelty

Post contends that the finding of deliberate cruelty is clearly erroneous and neither supported by the record nor specific enough to permit meaningful appellate review. The latter contention is without merit. Both the trial court's individual findings of fact and its reference to the case law upon which it relied provide this court with ample guidance from which to conduct its review.

We have defined deliberate cruelty as consisting "of gratuitous violence, or other conduct which inflicts physical, psychological or emotional pain as an end in itself",[5] and have frequently upheld the imposition of an exceptional sentence for deliberate cruelty during rape. In *State v. Dennis,* 45 Wn. App. 893, 728 P.2d 1075 (1986), *review denied,* 108 Wn.2d 1008 (1987), a sentence beyond the standard range was justified where the crime involved multiple penetrations and was in the nature of a "'gang rape'".

---

[5]*Strauss,* 54 Wn. App. at 418.

*Dennis,* 45 Wn. App. at 895–97. In *State v. Altum,* 47 Wn. App. 495, 735 P.2d 1356, *review denied,* 108 Wn.2d 1024 (1987), the Supreme Court upheld an exceptional sentence for deliberate cruelty where the trial court found that the crime was excessively violent and brutal, involved repeated acts of forcible intercourse, humiliation, degradation, and physical assault, included threats against the victim's life, and lasted for a period of time in excess of 3 hours. *Altum,* 47 Wn. App. at 502. In *State v. Falling,* 50 Wn. App. 47, 747 P.2d 1119 (1987), this court upheld an exceptional sentence stating that the threats, the multiple penetrations, and the defendant's demonstrated contempt for the victim manifested deliberate cruelty. *Falling,* 50 Wn. App. at 55.

More recently, however, this court distinguished the above cases to hold in *Strauss* that the trial court's finding of deliberate cruelty was clearly erroneous. There, the conduct at issue consisted of holding (though not necessarily choking) the victim by the throat and telling her that "it was worth her life to cooperate". *Strauss,* 54 Wn. App. at 418. This court opined:

> Strauss' conduct was not *gratuitous* violence, but rather was for the purpose of exacting compliance from [the victim]. Strauss did not strike her or inflict additional injuries other than the rape. . . . we find that Strauss' conduct was of the type normally associated with this crime.

*Strauss,* 54 Wn. App. at 418–19. Although Strauss penetrated the victim more than once, we distinguished the facts in *Strauss* from those of *Dennis* and *Falling,* where the factor of multiple penetrations was properly used as a ground for finding deliberate cruelty.

> In *Dennis,* the victim was raped by more than one person after she had been kidnapped and threatened with a handgun. The multiple penetrations took place over a protracted period of time. In *Falling,* the defendant broke into the victim's apartment in the middle of the night, threatened her with a knife, and engaged in oral and vaginal intercourse for a 30–minute period. In contrast, Strauss was the only perpetrator and his conduct was much more time limited.

*Strauss,* 54 Wn. App. at 419.

Applying the definition and the decisions outlined above to the facts in the instant case, the trial court's finding that Post's conduct manifested deliberate cruelty cannot be upheld. The violence in the rape of M was not gratuitous. That violence which did occur, the choking and the muzzling, was for the purpose of exacting compliance. The use of a knife in the commission of a rape is an element of rape in the first degree, RCW 9A.44.040(1)(a), and therefore cannot justify an exceptional sentence. *Nordby*, 106 Wn.2d at 518; *Falling*, 50 Wn. App. at 54.

Other physical, psychological or emotional pain suffered cannot be said to have been inflicted as an end in itself. Two of the trial court's findings of fact are relevant to this issue: the offenses lasted nearly an hour in duration and the defendant attempted multiple penetrations. As noted above, the factor of multiple penetrations was used to support a finding of deliberate cruelty in *Dennis* and *Falling*. However, the instant case is distinguishable. The penetrations in *Falling* were both oral and vaginal. In the present case, penetration was only vaginal and although there were multiple attempts, penetration was accomplished only once.

What remains is the temporal characteristic of the crime. The alleged duration of the sexual assault in the instant case was nearly twice that in *Falling*, approximately 1 hour. Two problems arise, however. First, the record does not clearly establish that the offense lasted as long as alleged. Second, even assuming the rape lasted an hour, we are unwilling to hold that such duration alone amounts to conduct inflicting physical, psychological or emotional pain as an end in itself.

The reasons supplied by the sentencing judge in support of his finding that Post's conduct manifested deliberate cruelty are not supported by the record.

## B. Zone of Privacy

Post also contends that the trial court erred by concluding he had invaded the victim's "zone of privacy". Post correctly argues that the invasion of M's "zone of privacy"

was an act inherent in the crime of burglary in the first degree, and therefore may not be used as a reason to support an exceptional sentence for that crime.

Post was charged under count 1 with burglary in the first degree, committed as follows: "did enter and remain unlawfully in the dwelling of [M] . . . with intent to commit a crime against a person or property therein[.]"[6] Under count 2, Post was charged with rape in the first degree, committed as follows: "by forcible compulsion did engage in sexual intercourse with another person named [M] under circumstances where the defendant used or threatened to use a deadly weapon, to–wit: a knife, feloniously entered into the building where [M] was situated[.]" Arguably, each count describes acts consistent with the invasion of the victim's "zone of privacy".

The State contends that *Falling* controls. In *Falling,* this court held that the rape of the victim in her bedroom was an aggravating circumstance as an invasion of her zone of privacy. *Falling,* however, did not involve a burglary conviction. Further, the scope of the "zone of privacy" was not defined in *Falling.* Language adopted from a Minnesota case in *Falling* appears to include the entirety of one's home within the "zone".

> [The assailant] did not just invade the victim sexually but also invaded the zone of privacy *surrounding and including her home.* As a result, the victim has to contend psychologically not only with the fact that she was sexually assaulted in a brutal way but also with the fact that *her home is no longer the island of security that she perhaps thought it was.*

(Italics ours.) *Falling,* 50 Wn. App. at 55 (quoting *State v. Van Gorden,* 326 N.W.2d 633 (Minn. 1982)).

We conclude that invasion of the victim's zone of privacy cannot be used as a basis for imposition of an exceptional

---

[6]Similarly, to convict Post of the crime of burglary in the first degree, the jury had to find, in addition to other elements, (1) that Post entered or remained unlawfully in a dwelling; and (2) that the entering or remaining was with intent to commit a crime against a person or property therein. (Instruction 8).

sentence when unlawful entry into the victim's home is an element of a crime for which the sentence is imposed.

## C. Future Dangerousness

Post further contends that the testimony of Dr. Trowbridge at sentencing regarding his amenability to treatment and future dangerousness violated the psychologist/patient privilege and his Fifth Amendment right to remain silent.

In September of 1980, Dr. Brett Trowbridge was employed as a consultant for the Department of Corrections. In that capacity, Trowbridge interviewed Post for the purpose of determining Post's potential dangerousness were he to be reassigned from the prison population into a work release environment. As a result of that interview Trowbridge prepared a written report which became a permanent part of Post's Department of Corrections file.

At sentencing, the State called Trowbridge to present evidence as to Post's future dangerousness. Post objected to the use of Trowbridge's written report, and to Trowbridge's testimony regarding his evaluation of Post. Post based his objection on two grounds: (1) that the psychologist/patient privilege (referred to as the doctor/patient privilege at sentencing) protected all communications made by Post to Trowbridge and (2) because Dr. Trowbridge did not advise him of his right to remain silent, the testimony would violate Post's Fifth Amendment right against self–incrimination. Post raises the identical issues on appeal.

## 1. *Psychologist/Patient Privilege*

The psychologist/patient privilege is codified in Washington under RCW 18.83.110.[7] Post maintains that *State v. Sullivan*, 60 Wn.2d 214, 373 P.2d 474 (1962) court held that

---

[7]RCW 18.83.110 provides:

"Confidential communications between a client and a psychologist shall be privileged against compulsory disclosure to the same extent and subject to the same conditions as confidential communications between attorney and client, but this exception is subject to the limitations under RCW 70.96A.140 and 71.05.250 [relating to involuntary commitments]."

the doctor/patient privilege is applicable to criminal proceedings. *Sullivan,* 60 Wn.2d at 223 (citing *State v. Miller,* 105 Wash. 475, 178 P. 459 (1919)). In order to invoke the privilege, the patient need only to have consented to the examination and confided in the doctor in the belief that he would receive treatment.

> ". . . In order to render a physician incompetent, the information which he is called upon to disclose must have been acquired while he was attending the patient in a professional capacity *for the purpose of treating her ailments*; there is no privilege when the examination is made by the physician for the express purpose of publishing the results— such, for example, as testifying in an action for personal injuries. . . ."

(Italics ours.) *Sullivan,* 60 Wn.2d at 224 (quoting *Strafford v. Northern Pac. R.R.,* 95 Wash. 450, 453, 164 P. 71 (1917)).

The court commented that actual treatment of the patient is not necessary in order to create the relation of physician and patient. Rather, if the physician makes an examination of the patient with his or her consent, and the patient believes that the examination is being made for the purpose of providing treatment, then the relation is created by implication. *Sullivan,* 60 Wn.2d at 224. Purely forensic examinations by a physician are not, however, within the "statutory testimonial prohibitions" of the doctor/patient privilege. *Sullivan,* 60 Wn.2d at 223.

In order for the privilege to apply, the communication must originate in confidence that it will not be disclosed. *State v. Wilder,* 12 Wn. App. 296, 299, 529 P.2d 1109 (1974). Though Trowbridge admitted it was unlikely he told Post that his report would be used for any other purpose than his institutional adjustment, he testified he routinely told everyone he saw that his report would become a permanent part of the Department of Corrections file. Trowbridge testified that he did not consider his contact with Post to be privileged.

Because Trowbridge was examining him for the purpose of making a recommendation about placement which

included the possibility of placement in a treatment facility, Post argues his interview with Trowbridge falls within the privilege. We disagree. The definition of treatment in this context is not so elastic. Post was not sent to Trowbridge for treatment. Trowbridge was not a treating physician or psychologist. There is no indication Post believed he would be receiving treatment as a result of the interview.

The purpose of the interview was to gather information so that Trowbridge could make a recommendation to a third party regarding Post's future dangerousness and how he should be handled on work release. The interview was not subject to the psychologist/patient privilege.

### 2. *Self–Incrimination*

The United States Supreme Court has stated that "[t]he fact that respondent's statements were uttered in the context of a psychiatric examination does not automatically remove them from the reach of the Fifth Amendment." *Estelle v. Smith,* 451 U.S. 454, 465, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981). In *Estelle,* the Supreme Court held that the defendant's Fifth Amendment rights were violated when statements he made in a pretrial psychiatric examination were used against him at sentencing, because those statements were elicited without proper *Miranda* warnings.

In Washington, the privilege against self–incrimination applies to statements made to mental health professionals. *State v. Bonds,* 98 Wn.2d 1, 653 P.2d 1024 (1982), *cert. denied,* 464 U.S. 831, 78 L. Ed. 2d 112, 104 S. Ct. 111 (1983). In *State v. Sargent,* 111 Wn.2d 641, 762 P.2d 1127 (1988), our Supreme Court held that a defendant's Fifth Amendment rights were violated when a presentence investigator interviewed the defendant without administering *Miranda* warnings.

> [S]elf–incriminating statements obtained from an individual in custody are presumed to be involuntary, and to violate the Fifth Amendment, unless the State can show that they were preceded by a knowing and voluntary waiver of the privilege.

*Sargent,* 111 Wn.2d at 648.

The considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to [a] pretrial psychiatric examination[.]

*Estelle,* 451 U.S. at 467.

Under *Sargent,* to be subject to *Miranda,* the interview must be (a) custodial, (b) interrogation, (c) by an agent of the State. *Sargent,* 111 Wn.2d at 647. The first and last criteria are clearly met here. Interrogation under *Miranda* refers to questions, words, or actions reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis,* 446 U.S. 291, 301, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980). Since the purpose of the interview was to glean information from Post to determine his fitness for institutional adjustment, it is reasonable to expect that some of the questions were likely to elicit incriminating responses.

Thus, under *Estelle* and *Sargent,* it was improper for the trial court to consider Dr. Trowbridge's written and oral testimony regarding Post's future dangerousness because it was based largely upon a psychological examination conducted without first warning Post of his right to remain silent.

We next consider whether the error was harmless. The error was of constitutional magnitude and reversal is required unless the error was harmless beyond a reasonable doubt. *State v. Belmarez,* 101 Wn.2d 212, 216, 676 P.2d 492 (1984). The courts of this state apply the overwhelming untainted evidence test in determining whether such an error is harmless. *State v. Guloy,* 104 Wn.2d 412, 426, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020, 89 L. Ed. 2d 321, 106 S. Ct. 1208 (1986).

In the absence of Trowbridge's testimony, there is overwhelming evidence that Post represents a future danger to society. Post's prior criminal history evidences two other first degree rape convictions and a felony escape conviction. The present offenses were committed relatively soon after Post had been released from prison. This history of committing sexual offenses alone supports the trial

court's finding of future dangerousness. *See State v. Olive,* 47 Wn. App. 147, 150, 734 P.2d 36, *review denied,* 109 Wn.2d 1017 (1987); *State v. Woody,* 48 Wn. App. 772, 780, 742 P.2d 133 (1987), *review denied,* 110 Wn.2d 1006 (1988).

██ Moreover, while a number of the reasons given by the trial court were inadequate grounds for imposing the exceptional sentence, it is unnecessary to remand the case for resentencing. Where fewer than all of the trial court's reasons for imposing a sentence beyond the standard range are appropriate, remand is unnecessary when the reviewing court is confident that the trial court, after limiting its consideration to the proper factors, would impose the same sentence. *State v. Tunell,* 51 Wn. App. 274, 284, 753 P.2d 543, *review denied,* 110 Wn.2d 1036 (1988); *see State v. Fisher,* 108 Wn.2d 419, 429, 739 P.2d 683 (1987); *State v. Nordby,* 106 Wn.2d 514, 723 P.2d 1117 (1986). We are convinced from a review of the trial judge's comments at sentencing that he would impose the same sentence on remand.

### D. Fair and Impartial Presentence Writer

Finally, Post contends his right to due process was violated by the trial court's consideration of the community corrections officer's written report and testimony. He argues that principles underlying the due process clause of the Fourteenth Amendment, requiring a fair and impartial judge at all stages of a criminal proceeding, equally apply to a presentence writer as an arm of the judiciary. We find no merit to this argument.

Community corrections officer Tom Porro prepared a presentence report in this case on behalf of the Department of Corrections. That report, along with the reports of the prosecuting attorney, defense counsel, and Dr. Trowbridge, was considered by the trial court at sentencing. Post argues that Porro's presentence report and testimony should have been excluded from the sentencing hearing because he was suing Porro and the Department for allegedly violating his constitutional rights.

Porro's report reflects a recommendation based on the facts of the instant case and Post's criminal history. The trial court correctly ruled that any bias on the part of Porro affected the weight to be given his testimony and not its admissibility. Post's due process rights were not violated by admission of Porro's report or testimony.

Affirmed.

GROSSE, A.C.J., and SCHOLFIELD, J., concur.

Reconsideration denied November 7, 1990.

Review granted at 116 Wn.2d 1018 (1991).