**FILED**

**JULY 14, 2016**

In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32113-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LUIS A. AVILA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Luis Avila was convicted of second degree rape. At trial,

Detective Jackie Nichols testified about statements Mr. Avila made to her during an

interview. No CrR 3.5 hearing had been conducted prior to trial to determine whether her

statements were admissible. Mr. Avila appealed, and the case was remanded for a CrR

3.5 hearing, at which the trial court concluded the statements were voluntary and were

properly admitted at trial. Mr. Avila again appeals, arguing that (1) nine of the findings

of fact in the court's order lack substantial evidence in the CrR 3.5 hearing record, and

(2) the trial court erred when it found the interview was not a custodial interrogation.

Finding no error, we affirm.

FACTS AND PROCEDURAL BACKGROUND

On June 13, 2011, Detective Jackie Nichols received a report that Bonnie Larson,

an elderly woman residing at Sycamore Glen Family Home—an adult care facility—had

been raped at the facility by an employee later identified as Luis Avila.

Upon receiving this report, Detective Nichols called Mr. Avila and "asked if he would be willing to come in for an interview." Clerk's Papers (CP) at 99. Mr. Avila agreed, and together they "arranged a time which would be mutually convenient." *Id.* Sharee Kromrei, the owner of Sycamore Glen, and a friend of Mr. Avila's, then contacted Detective Nichols and asked to be present at the interview. Detective Nichols agreed.

On June 16, 2011, Ms. Kromrei drove Mr. Avila to the sheriff's office. Detective Nichols escorted them to the interview room, which is

> where we conduct all our interviews, victim interviews, child/victim interviews, adult interviews. So it's, the setting is conducive to being comfortable it's got upholstered chairs, pictures on the walls kind of a neutral tone to the paint, carpet, you know, it's like a throw rug type carpet on the floor.

Report of Proceedings (RP) (Jan. 15, 2015) at 9. Once in the interview room, Ms. Kromrei and Mr. Avila sat next to each other on the side of the table nearest to the door. Nothing blocked Mr. Avila's path to the door.

Detective Nichols, in full uniform, told Mr. Avila he was free to leave at any time. At no time was Mr. Avila handcuffed or physically restrained. Neither Ms. Kromrei nor Mr. Avila were searched. Detective Nichols did not inform Mr. Avila of his *Miranda*[1] rights before interviewing him.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

During the interview, which lasted no more than 20 minutes, Mr. Avila appeared to understand the questions he was asked and the allegations at issue, never declined to answer any questions, never requested an interpreter or a lawyer, and never asked to leave. When the interview was over, Mr. Avila and Ms. Kromrei walked out of the sheriff's office together.

Nearly a year later, on May 15, 2012, the State charged Luis Avila with the second degree rape of Bonnie Larson. In preparation for trial, defense counsel did not request a CrR 3.5 hearing to determine whether Mr. Avila's statements to Detective Nichols had been made voluntarily. At trial, Detective Nichols testified about the statements Mr. Avila made during the interview. Mr. Avila also testified at trial in his own defense. The statements Detective Nichols attributed to Mr. Avila were inconsistent with Mr. Avila's trial testimony. At the conclusion of the trial, the jury found Mr. Avila guilty, and the court sentenced him to 90 months to life.

Mr. Avila appealed, challenging for the first time the voluntariness of the interview statements to which Detective Nichols testified. In response, the State requested the matter be remanded to the trial court for a CrR 3.5 hearing. A commissioner of this court granted the State's motion and issued an order remanding the case for a CrR 3.5 hearing.

The CrR 3.5 hearing occurred on January 15, 2015. The court entered an order concluding the interview was not a custodial interrogation and therefore Mr. Avila's statements were voluntary and admissible. The order contains the following findings of fact:

1.   On June 12, 2011, Bonnie J. Larson, an elderly resident of the Sycamore Glen Family Home, a facility licensed by the state for long-term care, told various people at her church that she had been forcibly raped by an employee of the home the previous night.

2.   On June 13, 2011 while at a local hospital for a routine appointment, Ms. Larson reported again that she had been raped at Sycamore Glen on June 11, 2011 by a caregiver named "Luis." She was given a rape examination but there were no overt signs of assault. The medical personnel collected "swabs" as part of a standard rape kit, which were sent to the Washington State Patrol Crime Lab for analysis.

3.   The medical personnel contacted law enforcement and Detective Jackie Nichols of the Asotin County Sheriff's Office was assigned the case and responded to the hospital to investigate.

4.   Detective Nichols interviewed Ms. Larson at the hospital and spoke with other potential witnesses.

5.   The Detective contacted [Sharee] Kromrei, the Administrator of Sycamore Glen. Ms. Kromrei told Detective Nichols that the employee identified as "Luis" was LUIS A. AVILA. She indicated that she was a friend of Mr. AVILA's and that she had heard about the report but did not believe it. She told the Detective that she had already spoken with Mr. AVILA and that he had told her that the accusations were "completely false." Throughout the entire investigation Ms. Kromrei advocated for, and assisted Mr. AVILA.
     . . . .

8.   On June 16, 2011, during regular working hours, LUIS A. AVILA and Sharee Kromrei arrived at the Asotin County Sheriff's Office for the interview, having driven to that location in a private vehicle.

4

No. 32113-4-III
*State v. Avila*

They were met by Detective Nichols in the lobby and escorted to the interview room inside of the Sheriff's Office.

9. The interview room is regularly used for non-custodial interviews of witnesses, victims (including child victims), and persons of interest. The room is decorated in a nonthreatening manner with "homey" decor which includes muted lighting, upholstered chairs, pictures on the walls, and small throw rug on the floor.

. . . .

13. Prior to asking any questions, Detective Nichols told Mr. AVILA that he was not under arrest and that he was free to leave at any time. At no time during the interview was Mr. AVILA handcuffed or physically restrained in any manner. Neither he nor Ms. Kromrei was searched nor were they even asked whether they were carrying any weapons.

16. The Detective began the interview by telling Mr. AVILA about the accusations and asked him for his account of the evening in question.

CP at 98-100.

## ANALYSIS

Mr. Avila appeals, arguing that (1) insufficient evidence supports nine of the trial court's findings of fact, and (2) the trial court erred when it concluded the interview with Detective Nichols was not a custodial interrogation. Each argument is addressed in turn.

*1. Because we may take judicial notice of the record in the case presently before us, substantial evidence supports the trial court's findings*

Mr. Avila argues the court included numerous findings of fact in its order on the CrR 3.5 hearing that were not supported by any evidence in that hearing record.

5

This argument lacks merit. Judicial notice is allowed at any stage of the proceeding. ER 201(f). "We may take judicial notice of the record in the case presently before us or 'in proceedings engrafted, ancillary, or supplementary to it.'" *In re Adoption of B.T.*, 150 Wn.2d 409, 415, 78 P.3d 634 (2003) (quoting *Swak v. Dep't of Labor & Indus.*, 40 Wn.2d 51, 53, 240 P.2d 560 (1952)). The CrR 3.5 hearing was conducted to determine whether certain evidence was admissible at trial and was part of the same case. Accordingly, we, like the trial court, may take judicial notice of the trial record. It contains substantial evidence for each of the challenged findings of fact. "Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise." *Holland v. Boeing Co.*, 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978).

The record shows Ms. Larson was a resident at Sycamore Glen Family Home, which is a licensed adult care facility. Ms. Larson testified that she told "several people" at church that she had been raped. RP (Oct. 8, 2013) at 96. This report was made "the morning after" the rape, on June 12, 2011. *Id.* at 72. Substantial evidence supports finding of fact 1.

There was testimony that on June 13, 2011, Ms. Larson had a routine appointment with her counselor at a facility affiliated with St. Joseph's Hospital. The record shows that when Ms. Larson told her counselor she had been raped by a caregiver named "Luis"

at Sycamore Glen on June 11, 2011, he sent her to the emergency room for a sexual assault exam. Detective Nichols testified that the exam found no overt signs of sexual assault. The record reflects that the nurse at the hospital collected swabs as part of a sexual assault exam, and sent them to the Washington State Patrol Crime Lab for analysis. Substantial evidence supports finding of fact 2.

Detective Nichols testified that the medical personnel at "St. Joseph's Hospital or a medical facility affiliated with St. Joseph's" called the Asotin County Sheriff's Office to report the sexual assault. RP (Oct. 8, 2013) at 38. Detective Nichols stated she responded to the report and went to St. Joseph's to interview Ms. Larson. Detective Nichols also said she spoke with other potential witnesses. Substantial evidence supports findings of fact 3 and 4.

Detective Nichols testified she contacted Ms. Kromrei to ask her about Ms. Larson's report. The record does not reflect that Ms. Kromrei is the "administrator" of Sycamore Glen, but rather that she is the "owner" and "operator" of that facility. RP (Oct. 9, 2013) at 232. This difference is inconsequential. Detective Nichols testified that Ms. Kromrei identified herself as Mr. Avila's friend. The record reflects that upon receiving the report of the rape from one of her caregivers, Ms. Kromrei responded that "that couldn't have happened" because Mr. Avila was from her church and had just gotten married and had a baby. RP (Oct. 8, 2013) at 82. Testimony shows Ms. Kromrei

7

asked to attend Mr. Avila's interview with Detective Nichols, told Mr. Avila not to worry because she would be present and if he were arrested she would be able to help him, and then drove him to the interview. The evidence also shows that at the interview Mr. Avila consulted Ms. Kromrei about whether to allow Detective Nichols to record the interview. This is sufficient evidence to support a finding that Ms. Kromrei advocated for Mr. Avila throughout the investigation. Sufficient evidence supports finding of fact 5.

The record demonstrates that on June 16, 2011, Ms. Kromrei drove Mr. Avila to the Asotin County Sheriff's Office for an interview with Detective Nichols. Mr. Avila testified they were met by Detective Nichols, who led them to the interview room. There is no direct evidence that the interview occurred during "regular working hours," but the record shows that Detective Nichols and Ms. Kromrei arranged a time for the interview that was "mutually convenient," RP (Jan. 15, 2015) at 11, and that between 5 to 10 officers were present at the sheriff's office at the time of the interview, which provides substantial evidence for that finding. Substantial evidence supports finding of fact 8.

Detective Nichols testified that the interview room at the sheriff's office is used for all interviews, including victim, child victim, and adult interviews. She stated the room has upholstered chairs, pictures on the wall, and "a throw rug type carpet on the floor." RP (Jan. 15, 2015) at 12. She said the room was more like a home than a jail. The record does not reflect that the lighting is muted, but rather that the paint on the walls

8

is neutral in tone. Neither does the record reflect that the throw rug is "small." However, the remainder of the evidence supports the finding that the room is nonthreatening and comfortable. Substantial evidence supports finding of fact 9.

Before asking any questions in the interview, Detective Nichols testified she told Mr. Avila he was free to leave at any time. The record does not reflect that Detective Nichols told Mr. Avila that he was not under arrest. But the record shows Mr. Avila was not handcuffed or restrained in any manner, and neither he nor Ms. Kromrei were searched. The record contains no evidence whatsoever about whether they were asked if they had weapons. Though substantial evidence supports only part of finding of fact 13, the unsupported portions do not affect our ultimate conclusion and need not be stricken.

Detective Nichols testified she began the interview by telling Mr. Avila she knew he was aware of the allegations, and then asked him to tell her what happened on the night of June 11, 2011. The record does not reflect that Detective Nichols told Mr. Avila about the allegations, but it does reflect that Mr. Avila knew of the allegations. Again, though substantial evidence supports only part of finding of fact 16, this does not affect our ultimate conclusion and the unsupported portion need not be stricken.

### 2. *The interview was not custodial*

Mr. Avila argues the court should not have allowed Detective Nichols to testify at trial about the statements he made to her during the interview on June 16, 2011, because

9

the interview was a custodial interrogation and he was not informed of his *Miranda* rights.

The Fifth Amendment to the United States Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. To protect this right and to ensure a defendant's statements are voluntary, *Miranda* warnings are required whenever a defendant is subjected to a custodial interrogation by a state agent. *Miranda*, 384 U.S. at 439; *State v. Lorenz*, 152 Wn.2d 22, 36, 93 P.3d 133 (2004). The failure to administer *Miranda* warnings when the defendant is in custodial interrogation renders the defendant's statements involuntary and inadmissible at trial. *State v. Lozano*, 76 Wn. App. 116, 118-19, 882 P.2d 1191 (1994) (citing *Oregon v. Elstad*, 470 U.S. 298, 307, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985)). A trial court's custodial determination is reviewed de novo. *Lorenz*, 152 Wn.2d at 36.

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) (footnote omitted); *State v. Sargent*, 111 Wn.2d 641, 649, 762 P.2d 1127 (1988).

The State concedes Detective Nichols's interview of Mr. Avila was an "interrogation." We, therefore, need only consider whether it was "custodial."

An interrogation is "custodial" if the defendant's freedom of movement is curtailed. *Sargent*, 111 Wn.2d at 649-50. "An objective test is used to determine whether a defendant was in custody—whether a reasonable person in the individual's position would believe he or she was in police custody to a degree associated with formal arrest." *Lorenz*, 152 Wn.2d at 36-37 (citing *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)). The "freedom of movement, not the atmosphere or the psychological state of the defendant, is the determining factor in deciding whether an interview is 'custodial.'" *Sargent*, 111 Wn.2d at 649-50 (citing *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)).

Mr. Avila makes a number of arguments as to why a person in his position would not believe he had a right to leave the interview with Detective Nichols. First, he argues he has limited English comprehension and nothing is known about his education. However, though Mr. Avila is Guatemalan, Detective Nichols testified he appeared to understand her questions and that his answers to the questions were appropriate. Moreover, Mr. Avila prepared a written statement that he read to the court at the CrR 3.5 hearing that demonstrated his high level of English proficiency. His ability to understand sophisticated legal concepts is also demonstrated by his first statement of additional grounds for review (SAG). There is strong evidence that Mr. Avila had a sufficient grasp of English to understand that his participation in the interview was not compulsory.

11

Moreover, his experience with the legal system is some evidence that he was aware of what a custodial law enforcement environment looks like. He was arrested twice in 2006, twice in 2007, and once in both 2008 and 2010. The trial court could reasonably consider whether, after six arrests, Mr. Avila had enough experience to understand that the interview with Detective Nichols was not a custodial interrogation.

Second, Mr. Avila argues he understood Detective Nichols's "asking" him to come to the sheriff's office as an order and not a request. The trial court's unchallenged findings weaken this argument. The court found that Detective Nichols "asked" Mr. Avila if he would be "willing" to come down for an interview, and that they agreed to a time that was "mutually convenient." CP at 99. Additionally, the court found that Ms. Kromrei drove Mr. Avila to the interview—he was not transported there by law enforcement. These facts are indicative of a request, rather than an order, to come to the interview.

Third, Mr. Avila argues he did not understand he could leave because the interview room was behind locked doors at the stationhouse, and Detective Nichols was in uniform when she questioned him. However, the court found that before beginning the interview, Detective Nichols told Mr. Avila he was free to leave at any time. The court also found that Mr. Avila was not searched, handcuffed, or restrained in any way, that he sat on the side of the table nearest the door, and that no obstacle blocked his path to the

12

door. Moreover, the interview only lasted 20 minutes and when it was over Mr. Avila

simply walked out. A reasonable person in Mr. Avila's position would have known he

was free to leave.

Fourth, Mr. Avila argues the court improperly placed great weight on the fact that

Ms. Kromrei was present during the interview. Mr. Avila states he was never asked if he

would allow Ms. Kromrei to be present, and that no information suggests she would be

qualified to help him. Mr. Avila's own testimony at the hearing undercuts these

arguments:

> When I agreed about the interview that was after talking to [Sharee] and I
> explain her what I was afraid of and she is the one that told me not to be
> afraid because she was going to talk to Det. Nichols and she asked if she
> could be with me during the interview and she said that if I would have
> been arrested then she would have been able to help me. That's the reason
> why [Sharee] was present during the interview.

RP (Jan. 15, 2015) at 27. This shows Mr. Avila knew Ms. Kromrei was going to be at the

interview, and that he wanted her there. In addition, he conferred with her about whether

to allow the interview to be recorded, which not only shows that she helped him, but that

he knew he had the right to refuse. The simple fact of Ms. Kromrei's presence shows Mr.

Avila was not isolated and indicates a noncustodial environment. *See Miranda*, 384 U.S.

at 461 (noting that isolation may be used in a custodial interrogation to compel the

witness to speak).

13

Fifth, Mr. Avila argues that his choice to attend the interview was constrained because he thought the interview might concern working for Ms. Kromrei "under the table," and because he knew he was suspected of raping Ms. Larson. Appellant's Supp. Br. at 14. This argument is not persuasive because Detective Nichols told him he was free to leave at any time. Mr. Avila's psychological state of mind does not show the interview was custodial in the absence of any indication that his freedom of movement was restricted.

Finally, Mr. Avila argues the trial court improperly took judicial notice of the setup of the interview room. As discussed above, sufficient evidence supports the court's finding about the environment of the interview room.

Nothing about the interview suggested a custodial interrogation. The record supports the trial court's finding that the interview was not a custodial interrogation. The court did not err in concluding Mr. Avila's statements in the interview were voluntary and admissible at trial.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

In a pro se statement of additional grounds for review (SAG), as well as a supplemental SAG, Mr. Avila raises four grounds for review.

## 1. *Expert Testimony on DNA*[2]

Mr. Avila argues that the DNA expert's testimony about his genotype being unique in the population, and the testimony that under the "product rule" there was a 1 in 400 quadrillion chance that the DNA would match another person, was inadmissible.

Mr. Avila cites *State v. Cauthron*, 120 Wn.2d 879, 846 P.2d 502 (1993) and *State v. Buckner*, 125 Wn.2d 915, 890 P.2d 460 (1995) for support. However, the Supreme Court overruled *Cauthron*, and reversed *Buckner* in *State v. Buckner*, 133 Wn.2d 63, 941 P.2d 667 (1997). There the court stated that the "product rule" is a generally accepted method of calculating statistical probabilities and that experts may give their opinion that a DNA profile is unique within the population. *Buckner*, 133 Wn.2d at 67. "Briefly restated, the product rule (or 'multiplication rule') . . . means that the probability of a genetic profile occurring in the population is the product of the probabilities of each individual allele's occurrence in the population." *State v. Copeland*, 130 Wn.2d 244, 264-65, 922 P.2d 1304 (1996).

The DNA expert described his application of the product rule, by which he concluded there was a 1 in 400 quadrillion chance that the DNA could have come from someone other than Mr. Avila:

---

[2] Deoxyribonucleic acid.

So, each number has what's called a probability or a chance that it is supposed to occur within the U.S. population. That program then takes each of those numbers I obtain and multiples them together. And so since you have a lot of numbers, you get a very low probability because 1:400 quadrillion is actually a very small chance that it will happen again.

RP at 184. The expert's testimony was therefore proper.

Mr. Avila also objects to the DNA evidence in general, arguing it is susceptible to laboratory error, mishandling, mislabeling, and contamination.

[O]nce DNA evidence is determined to be generally admissible, then both proponents and opponents of a particular test should be able to garner the necessary information to present both sides of the issue to the factfinder when there is a challenge to the validity of a given laboratory procedure.

*State v. Kalakosky*, 121 Wn.2d 525, 541, 852 P.2d 1064 (1993). Only where laboratory error is so serious that the results will not be helpful to the jury can the trial court, in its discretion, rule the evidence inadmissible. *Id.* In Mr. Avila's case, defense counsel had an opportunity to cross-examine the expert, and the only issue about the validity of the tests was whether the results were compromised by the length of time (six months) that the sample sat in the laboratory before testing. The delay was due to backlogging and does not appear to have compromised the evidence. Accordingly, where Mr. Avila has failed to identify any evidence to suggest laboratory error in this specific case, the trial court did not abuse its discretion when it admitted the evidence. To the extent Mr. Avila

16

challenges the credibility of the evidence, it is the province of the jury to determine what weight to assign that evidence. *Copeland*, 130 Wn.2d at 270.

### 2. *Improper Closing Argument*

Mr. Avila claims the State improperly vouched for its witness's credibility when the prosecutor said during closing arguments: "She told the truth." SAG at 4. This is a slight misquote of the prosecutor's actual words, which were: "Old lady, told the truth every time." RP (Oct. 10, 2013) at 349.

"It is improper for a prosecutor personally to vouch for the credibility of a witness." *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995). "Prosecutors may, however, argue an inference from the evidence, and prejudicial error will not be found unless it is 'clear and unmistakable' that counsel is expressing a personal opinion." *Id.* (quoting *State v. Sargent*, 40 Wn. App. 340, 344, 698 P.2d 598 (1985)). Where, as here, defense counsel did not object to the prosecutor's statements, reversal is required only if the "'misconduct is so flagrant that no instruction can cure it.'" *State v. Belgarde*, 110 Wn.2d 504, 508, 755 P.2d 174 (1988), *aff'd*, 119 Wn.2d 711, 837 P.2d 599 (1992) (quoting *State v. Case*, 49 Wn.2d 66, 74, 298 P.2d 500 (1956)).

In this case, it is clear from the context that the prosecutor did not offer a personal opinion, but instead summarized all of the evidence and made an inference from that evidence that Ms. Larson—who he also described as having "some bad mental problems"

17

and "get[ting] confused sometimes"—told the truth. RP (Oct. 10, 2013) at 348.

Accordingly, the prosecutor's comment was not improper. *See State v. Jackson*, 150 Wn.

App. 877, 884-85, 209 P.3d 553 (2009) (finding that the prosecutor did not vouch for a

witness's credibility where he reminded the jury that it was the sole judge of credibility,

outlined the evidence and the reasonable inferences from it, and concluded that the jury

could find the witness credible).

Furthermore, the trial court instructed the jury that counsel's statements were not

evidence and should be disregarded if not supported by the evidence. This instruction

was sufficient to limit any prejudice. *See State v. Castro*, 32 Wn. App. 559, 567, 648

P.2d 485 (1982) (finding prosecutor's statement that a witness told the truth was not

prejudicial error because the court told the jury to disregard any statements not supported

by the evidence).

### 3. *Ineffective Assistance of Counsel*

Mr. Avila argues defense counsel provided ineffective assistance when he moved

to dismiss charges rather than for a mistrial. Here, though, the record shows the court

considered a motion for mistrial. The court first stated: "Your motion for mistrial is

respectfully denied." RP (Oct. 9, 2013) at 228. The court then said: "And so for the

record the motion to dismiss and/or mistrial are both denied." *Id.* Mr. Avila cannot

complain that defense counsel did not move to dismiss when the court clearly understood

18

No. 32113-4-III
*State v. Avila*

the motion was for dismissal or mistrial. Mr. Avila did not receive ineffective assistance of counsel.

### 4. *Due Process*

Mr. Avila argues the State violated his due process right to gather evidence in his own defense, alleging the State withheld evidence. Specifically, he alleges the State did not disclose that some of the DNA sample remained and could have been tested. *Id.* at 216. This claim fails. The record shows it was not the raw DNA sample that remained, but the DNA extract that was left over after the DNA had been tested. In addition, the defense was notified that this extract existed in the crime lab report of June 27, 2012. Where the prosecution did not withhold any evidence, there was no violation of the discovery rules and no violation of due process.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, J.

19